IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No. 1:15-cv-00416-WYD-KLM

BRANTA, LLC, a Delaware limited liability company;
BRANTA EXPLORATION & PRODUCTION COMPANY, LLC, a Delaware limited liability
company;
HARVEST (US) HOLDINGS, INC., a Delaware corporation; and
HARVEST NATURAL RESOURCES, INC., a Delaware corporation,
                    Plaintiffs,
v.

NEWFIELD PRODUCTION COMPANY, a Texas corporation,
                    Defendant.

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

## FINDINGS OF FACT

## I.    STIPULATED JOINT FACTS[1]

### A.    PROCEDURAL BACKGROUND

1.      On February 27, 2015, Plaintiffs Branta, LLC ("Branta"), Branta Exploration

& Production Company, LLC ("Branta E&P"), Harvest (US) Holdings, Inc. ("Harvest"), and

Harvest Natural Resources, Inc. ("HNR") filed a Complaint against Defendant Newfield

Production Company ("Newfield"). (ECF No. 1.)

2.       Newfield answered Plaintiffs' complaint on May 18, 2015. (ECF No. 13.)

3.      On September 9, 2015, Plaintiffs filed their First Amended Complaint and Jury

Demand, adding new defendants Crescent Point Energy Corporation and Ute Energy, LLC ("Ute

Energy"). (ECF No. 35.)

4.      On August 19, 2016, Plaintiffs filed a Motion for Partial Summary Judgment on

---

[1] Section I contains the parties Joint Submission of Stipulated Proposed Findings of Fact ("Joint Facts") (ECF No. 496), filed on January 16, 2018.

1

Liability. (ECF No. 142.)

5. On December 12, 2016, Newfield filed a Motion for Summary Judgment. (ECF No. 235.)

6. Plaintiffs moved to amend their Complaint a second time and their Second Amended Complaint and Jury Demand was entered on the docket on February 1, 2017. (ECF No. 258.)

7. The Court denied both summary judgment motions on June 21, 2017. (ECF No. 415.)

8. A 10-day trial to the Court commenced on September 11, 2017.

**B.   PARTIES AND BACKGROUND FACTS**

9. Branta is a privately held company that develops oil and natural gas resources. (ECF No. 258 ¶ 1.)

10. Branta is the parent company of Branta E&P, a privately held oil and natural gas exploration and production company. (ECF No. 258 ¶¶ 1–2.) Branta E&P is a wholly-owned subsidiary of Branta. (*Id*. at ¶ 2.)

11. HNR was a publicly traded company and the parent of Harvest, which invested in, acquired, and developed oil and gas assets. (ECF No. 258 ¶¶ 3–4; Nesselrode Trial Test., Vol. IV, 724:10–11.) Harvest is a wholly-owned subsidiary of HNR. (ECF No. 258 ¶ 4.)

12. In 2009, Branta E&P and Harvest owned oil and gas assets in the Uintah Basin in the State of Utah; Branta E&P own 40% of the Uinta Basin assets and Harvest owned the remaining 60%. (Edmiston Trial Test., Vol. IV, 804:24–805:3.)

13. Newfield is an oil and gas exploration and production company with operations throughout the United States and internationally, including in the Uintah Basin. (2015 Newfield Form 10-K at 3, available at http://phx.corporate-ir.net/phoenix.zhtml?c=63798&p=irol-

reportsannual.)

14.     In January 2011, Plaintiffs decided to conduct an auction for the sale of their

Uinta Basin assets. (ECF No. 258 ¶ 15.)

15.     In advance of the auction, Bank of America Merrill Lynch ("BAML"), which had

been engaged to provide financial advice and assistance to Plaintiffs in connection with the

auction, prepared a contact list that tracked entities Plaintiffs and/or BAML thought might be

interested in the Uintah Basin assets and recorded contacts with those entities. (Trial Ex. 18.)

16.     Newfield was on BAML's contact list. (Trial Ex. 18 at BofA_000023.)

17.     Throughout 2010 and 2011, Ute Energy was an oil and gas exploration and

production company operating in the Uinta Basin. (Jaggers Trial Test., Vol. I, 78:1–2, 78:17–24.)

18.     In early 2011, Ute Energy was interested in acquiring assets in the Uintah Basin.

(Jaggers Trial Test., Vol. I, 116:9–11.)

19.     The Bridgeland Exploration and Development Agreement ("Bridgeland EDA")

created an Area of Mutual Interest ("AMI"). (Trial Ex. 25 at Art. XX.)

**C.     NEWFIELD'S CONFIDENTIALITY AGREEMENT WITH BRANTA**

20.     In February 2010, Branta notified Newfield of its plan to sell some of Branta

E&P's share of the Uinta Basin assets. (Trial Ex. 33.)

21.     To facilitate discussions of a potential sale of the Branta E&P assets to Newfield,

on February 22, 2010, Branta and Newfield executed a confidentiality agreement (the "Branta

Confidentiality Agreement") with respect to a potential acquisition by Newfield of Branta E&P's

assets. (Trial Ex. 27.)  The original term of the Branta CA was eighteen (18) months. (*Id.* at ¶ 8.)

22.     Under the Branta Confidentiality Agreement, Branta agreed to share confidential

and proprietary information with Newfield related to their Uintah Basin assets. (Trial Ex. 27.)

23.     The Branta Confidentiality Agreement states that Newfield agreed "[t]o keep the

[proprietary and confidential information ("PCI")] confidential and not to disclose the PCI to any

entity or person except to [Newfield]'s and its affiliates' respective employees, officers, directors,

counsel, accountants or consultants . . . on a need to know basis as is necessary to evaluate

[Branta] or [various oil and gas exploration prospects]." (*Id.* at ¶ 3(a).)

24.     The Branta Confidentiality Agreement also contains a "Non-Circumvention"

clause:

> Each party hereby agrees that neither it nor its representatives will
> contact (whether by telephone, email, in-person meeting or otherwise) any of
> the other party's or its subsidiary's [sic] of affiliate's lenders, equity owners, co-
> working interest owners, joint exploration and development partners or other
> persons having existing or prospective business relations with the other party or
> its subsidiaries without the other party's prior express written consent obtained
> at least 48 hours in advance of such proposed contact, which consent may be
> withheld in the applicable party's sole discretion, and no such contacts may be
> conducted unless a representative of the other party is present throughout any
> such contacts.

(*Id.* at ¶ 4.)

25.     The Branta Confidentiality Agreement states that it is governed by Texas law. (*Id.*

at ¶ 12(a).)

26.     The Branta Confidentiality Agreement applied to Branta and its affiliates,

including Branta E&P. (Trial Ex. 27.)

27.     On September 29, 2010, Newfield proposed to purchase Branta E&P's 30%

interest in the Uinta Basin assets for $77 million. Newfield's proposal was rejected. (Trial Exs.

47, A35.)

28.     On February 18, 2011, Newfield and Branta executed a letter that amended the

Branta Confidentiality Agreement (the "Amendment Letter"). (Trial Ex. 31.)

29.     The Amendment Letter applied to Branta and its affiliates, including Branta E&P.

(*Id.* at 1.)

30.     The Amendment Letter amended the Branta Confidentiality Agreement's Non-Circumvention provision to allow the parties to: (i) have contact with Harvest and its investment banker Merrill Lynch Securities in regards to Harvest's assets in the Uintah Basin; (ii) waive any prior breaches of the Branta CA arising out of any prior contacts with Harvest or Merrill Lynch Securities; and (iii) agree that the Branta CA was never intended to preclude either party "from contacting Harvest in respect of their respective relationships with Harvest that existed on the date of the [Branta] CA, including relationships as co-working interest owners or exploration and development partners in Uintah and Duchesne Counties, Utah." (*Id.* at 1.)

### D.     NEWFIELD'S CONFIDENTIALITY AGREEMENT WITH HNR

31.     On February 17, 2011, HNR entered into a confidentiality agreement (the "Harvest Confidentiality Agreement") with Newfield. (Trial Ex. 32.)

32.     The Harvest Confidentiality Agreement applied to HNR's subsidiaries, including Harvest. (*Id.* at 1 & ¶ 1.)

33.     Under the Harvest Confidentiality Agreement, HNR and Harvest agreed to share "Evaluation Material" with Newfield. (*Id.* at 1 & ¶ 3.)

34.     The Harvest Confidentiality Agreement stated that, without Harvest's prior written consent, Newfield "shall not disclose to or discuss with any third person," other than "the parent companies, subsidiaries and affiliates of the Parties . . . and each of their directors,  officers, employees, agents, financial advisors or lenders, contractors, and consultants," "either  the fact that discussions or negotiations are taking place concerning ['a strategic transaction  involving Harvest's assets in the United States located in the Uintah Basin, State of Utah (a  "Transaction")'] or any of the terms, conditions, or other facts with respect to any such  Transaction, including the status thereof." (*Id.* at 1 & ¶ 6.)

35.     The Harvest Confidentiality Agreement states that it is governed by Texas law.

(*Id*. at ¶ 16.)

36.     Harvest shared Evaluation Material with Newfield as provided for by the Harvest Confidentiality Agreement. (Trial Exs. 91, 92; Nesselrode Trial Test., Vol. IV, 751:19–23.)

**E.     COMMUNICATIONS BETWEEN NEWFIELD AND UTE ENERGY**

37.     Newfield did not have Plaintiffs' consent to contact Ute Energy about the auction. (Trial Exs. 57, 91.)

38.     On May 18, 2011, Howard and Jaggers had a lunch meeting, and afterwards, Jaggers was disappointed. (Jaggers Trial Test., Vol. I, 156:25–157:4; Howard Trial Test., Vol. II, 332:1–3, 438:24–439:1.)

39.     On May 20, 2011, Jaggers sent a letter to Howard. (Trial Ex. 1.)

**F.     BIDS FOR PLAINTIFFS' ASSETS**

40.     Before Newfield's initial March 7, 2011 bid, its technical team performed detailed economic analyses of Plaintiffs' assets. (Trial Exs. 110, 116–119, 122, 124.)

41.     On March 7, 2011, Newfield submitted a bid of $196,988,000 for Harvest's assets and a bid of $90,587,000 for Branta E&P's assets, for a total bid of $287,575,000. (Trial Exs. 127, 128.)

42.     On March 10, 2011, Bill Barrett Corporation ("BBC") submitted a bid that totaled $180,000,000 for just a portion of Plaintiffs' assets. (Trial Exs. 135, 136.)

43.     Ute Energy did not bid on Plaintiffs' assets during the auction. (Tresca Trial Test., Vol. III, 599:10–12.)

**G.     NEWFIELD'S PURCHASE OF PLAINTIFFS' ASSETS**

44.     Newfield submitted the highest bid in the auction and was awarded the opportunity to buy the Uintah Basin assets. (Trial Ex. 142.)

45.     HNR publicly announced Newfield's acquisition of Harvest's Uinta Basin assets

on March 22, 2011, including the amount to be paid for the assets. (Trial Ex. B69.)

46.     The sale of the Uintah Basin assets to Newfield closed on May 17, 2011. (Trial Ex. C46.)

47.     After the close of the transaction, Newfield offered Ute Energy an option pursuant to the Bridgeland AMI to purchase the portion of the acquired assets located within the Bridgeland EDA, and Ute Energy exercised the option and paid approximately $12.1 million to acquire the offered assets. (Trial Exs. C11, C13.)

## II.  **ASSET OWNERSHIP INTERESTS**

1.     Throughout 2010 and until March 21, 2011, Harvest (US) Holdings, Inc. ("Harvest (US)") and Brant Exploration & Production Company, LLC ("Branta E&P") owned a combined 100% working interest in approximately 69,399 net acres of mineral assets in the Uinta Basin (the "Uinta Basin Assets"). [Trial Ex. C49 at C49_0002, C49_0009, C49_0014, ¶¶ 2, 4, 30, 50; Nesselrode Testimony (Vol. IV – 738:16-18)]

2.     Harvest Natural Resources, Inc. ("HNR") and Branta, LLC ("Branta") did not own any of the Uinta Basin Assets, except through their subsidiaries Harvest (US) and Branta E&P. [Trial Ex. C49 at C49_0002, C49_0009, C49_0014, ¶¶ 1, 3, 30, 50]

## III.  **UTE ENERGY AND ITS AGREEMENTS WITH NEWFIELD**

3.     The Ute Indian Tribe owned 51% of Ute Energy, LLC ("Ute Energy"), and Quantum Energy Partners ("Quantum") owned 49%, though employees owned a part of the company, so it was not exactly 51/49. [Jaggers Testimony (Vol. I – 71:5-18; Vol. XI – 2045:19- 2047:3)] Nevertheless, at all relevant times, the Ute Indian Tribe was the majority owner of Ute Energy, LLC ("Ute Energy"). [Jaggers Testimony (Vol. I – 71:5-15)]

4.     Newfield had existing business relations with Ute Energy throughout 2010 and 2011, including as co-working interest owners and exploration and development partners in the

Uinta Basin.  [Trial Exs. 25, 28, 29, C38 at C38_0021-22 (Request for Admission # 20)]

5.       Ute Energy and the Ute Indian Tribe were partners with Newfield under several exploration and development agreements ("EDAs") in the Uinta Basin.  The relevant agreements were the Monument Butte Exploration and Development Agreement between the Ute Indian Tribe and Newfield executed on December 22, 2006, which the Ute Indian Tribe assigned to Ute  Energy in 2007 (the "Monument Butte EDA"), the Bridgeland Exploration and Development  Agreement between Ute Energy and Newfield executed on May 19, 2008 (the "Bridgeland EDA"), and the Rocky Point Exploration and Development Agreement and Area of Mutual  Interest Agreement (the "Rocky Point EDA") executed on September 27, 2010 between Ute  Energy and Newfield.  [Trial Exs. 25, 28, 29]

6.       EDAs are commonly used in the industry and by the Ute Indian Tribe to facilitate  the exploration and development of hydrocarbons.  Based on the testimony of Newfield's expert, Bruce Kramer, EDAs, like those entered into by Ute Energy and Newfield, provide  procompetitive benefits to the mineral owners, operators, and other working interest owners  through risk- and cost-sharing, and through the ability to obtain substantial efficiencies and  prevention of waste by allowing the development of large sections of land as a single lease.  [Kramer Testimony (Vol. VII – 1346:14-1351:4, 1365:15-1367:15, 1367:23-1370:10, 1371:1-  1372:10)]

7.       EDAs and their associated joint operating agreements ("JOAs") often contain or are accompanied by an area of mutual interest agreement or "AMI."  An area of mutual interest agreement is "an agreement between or among parties to an oil and gas farmout agreement, joint operating agreement or other agreement by which the parties describe a geographical area within which they agree to share certain additional leases or other interests acquired by any of them in the future."  8 Patrick H. Martin & Bruce M. Kramer, *Williams & Meyers Oil and Gas Law* 56

(2015). [Kramer Testimony (Vol. VII – 1350:10-1353:16, 1372:11-1374:14, 1375:6-10, 1375:13- 1376:13)]

8.    The purpose of a JOA is to share risks and costs, as well as information. JOAs allow for the exploration and development of oil and gas that otherwise might not get explored and developed, leading to greater production. [Tresca Testimony (Vol. III – 616:5-6, 616:12- 617:23); Kramer Testimony (Vol. VII – 1343:12-1344:7)]

9.    EDAs and AMIs promote risk-sharing. [Tresca Testimony (Vol. III – 616:12-617:23); Schulman Testimony (Vol. VI – 1130:11-22); Burtis Testimony (Vol. X – 1938:3-24)]

10.    Without the EDAs at issue in this case, the minerals would likely have remained in the ground. [Kramer Testimony (Vol. VII – 1348:22-1349:12)]. Due to the Ute Tribe's lack of money and experience, and Newfield's lack of access to the tribal lands, the EDAs provided a mutually beneficial arrangement between the Ute Tribe and Newfield to develop the assets. It is unlikely that either party could have developed the assets solo. [Schulman Testimony (Vol. VI – 1173:19-1174:2); Howard Testimony (Vol. II – 282:12-16); Packer Testimony (Vol. VII – 1422:22-1423:9)]

11.    Harvest (US) and Branta E&P were parties to an AMI agreement that covered the Uinta Basin Assets. [Trial Ex. A76 at A76_0022; Tresca Testimony (Vol. III – 617:25-618:8); Edmiston Testimony (Vol. IV – 866:23-24)]

12.    The Bridgeland EDA that Newfield entered into with Ute Energy contained an AMI. There was no AMI included in the Monument Butte EDA because, at the time it was executed, the Ute Tribe did not have an operating company or operating capabilities. [Packer Testimony (Vol. VII – 1421:9-13)] There was also a Rocky Point AMI between Newfield and Ute Energy. [Trial Ex. 29]

13.     Pursuant to the AMI contained in the Bridgeland EDA, Ute Energy and Newfield agreed that they would offer to each the option to purchase additional leases acquired within the area of mutual interest pursuant to agreed-upon terms.  [Trial Ex. 25 at §§ 1.10, 20.1]

14.     Pursuant to the AMI associated with the Rocky Point area, which was in the form of a December 20, 2010 amendment to a preexisting AMI covering the Rocky Point area, Ute  Energy and Newfield agreed to offer to each other the option to purchase assets acquired within the area of mutual interest pursuant to agreed-upon terms.  In particular, Ute Energy and Newfield  agreed that they would offer to each other leases acquired "through their own leasing activity [but  this was] not intended to apply to acquisitions of interests by any means other than new leasing."  [Trial Ex. 29 at 129-004 ¶ 1, 029-002 ¶ 5; Jaggers Testimony (Vol. I – 108:9-17)]

15.     The Ute Tribe was unwilling to enter into the Bridgeland EDA without the included AMI [Packer Testimony (Vol. VII – 1424:11-25)], thus the AMI was necessary to  allow the Tribe to share in additional acreage opportunities that would be developed within the Uintah Basin.

16.     It is the EDAs with its leasing and joint operating agreement aspects that create the precompetitive benefits, not the existence or nonexistence of the AMIs.  [Kramer Testimony (Vol. VII – 1385:14-1386:11)]  EDAs  and, when included, AMIs, are negotiated provisions between the parties under the particular  circumstances of each agreement, but are part of the joint collaboration to increase output of oil  and gas at lower costs.  [Kramer Testimony (Vol. VII – 1354:8-1356:1)]

## IV.     THE BRANTA CONFIDENTIALITY AGREEMENT

17.     In 2010, the Branta Entities explored raising additional capital for Branta E&P, or alternatively selling Branta E&P's share of the Uinta Basin Assets.  [Tresca Testimony (Vol. III –

552:22-553:4, 553:14-20, 554:10-15, 554:24-555:11)]

18.     Energy Capital Solutions ("ECS") was an investment banking firm engaged by Branta in 2010 and 2011.  Scott Trulock was the ECS principal with whom Branta worked.  Mr. Trulock was retained to assist in identifying a financial partner to invest in Branta.  [Tresca Testimony (Vol. III – 554:16-555:3, 601:15-602:3, 646:20-647:7)]

19.     As part of the effort to sell its assets or finance its operations, Branta established a data room for prospective buyers or investors, and required any data room visitor to execute a confidentiality agreement ("CA").  [Tresca Testimony (Vol. III – 558:18-559:2, 560:22-561:4, 600:24-601:14)]

20.     The Branta CA was drafted by the Branta Entities.  [Tresca Testimony (Vol. III – 621:18-25)]

21.     Paragraph 4 of the Branta CA, the non-circumvention provision, was a reciprocal provision intended to prevent each party from communicating with the other party's partners. [Tresca Testimony (Vol. III – 560:12-21, 623:22-624:6); Donohoue Testimony (Vol. V – 1068:24-1069:4, 1080:14-1081:20); Howard Testimony (Vol. II – 396:1-3); Trial Ex. 27 at 27-001, ¶ 4]  For example, Branta could not communicate with Newfield's partners to transact business that cut out Newfield.  But Branta could communicate with its own partners.  Similarly, Newfield could not communicate with Branta's partners to transact business that cut out Branta. But Newfield was free to communicate with its own partners.  [Howard Testimony (Vol. II – 397:12-21); Tresca Testimony (Vol. III – 623:22-625:1, 626:4-20)]

22.     Because, at the time the Branta CA was executed, Newfield and Ute Energy were partners under the three EDAs, the Branta CA did not prohibit Newfield from communicating with its partner, Ute Energy.  [Howard Testimony (Vol. II – 396:4-20)]

23.     The Branta Entities had no existing or prospective business relations with Ute

Energy at the time the Branta CA was executed.  [Tresca Testimony (Vol. III – 627:2-4, 627:11-18); Howard Testimony (Vol. II – 397:24-398:4)]  There was no evidence presented that Harvest had an existing or prospective business relationship with Ute Energy at that time either.

24.     Thus, the Branta CA prohibited Branta from communicating with Ute Energy without Newfield's prior written consent.

25.     On September 29, 2010, the same day Newfield made its $77 million offer for Branta's interests, Branta E&P's manager, Fred Tresca, instructed Scott Trulock of ECS to set up a meeting with Ute Energy.  [Trial Ex. A31; Trial Ex. A33; Tresca Testimony (Vol. III – 628:25-630:4)]  At the time, Ute Energy was Newfield's working interest partner and exploration and development partner in the Bridgeland, Monument Butte and Rocky Point EDAs.  [FF # 4-5, 12-14]

26.     On September 30, 2010, Mr. Trulock emailed the CEO of Ute Energy, Joseph Jaggers, asking for a meeting with Branta and Ute Energy to "see if there are any opportunities to work together."  [Trial Exs. A31, A32, A33; Tresca Testimony (Vol. III – 630:5-19); Jaggers Testimony (Vol. I – 218:24-219:24)]

27.     Mr. Jaggers agreed to a call, and, on October 4, 2010, Mr. Tresca and other representatives of the Branta Entities spoke with Ute Energy.  [Trial Ex. A34; Jaggers Testimony (Vol. I – 219:25-220:7)]

28.     Branta did not seek or obtain Newfield's consent prior to its September 30, 2010 outreach and October 4, 2010 conversation with Ute Energy.  [Howard Testimony (Vol. II – 398:5-18)]

V.     **THE AUCTION**

29.     HNR was motivated to sell Harvest (US)'s share of the Uinta Basin Assets in part because it needed to raise funds to cover debts coming due in the second quarter of 2011 after

12

unsuccessful attempts to market certain other assets in Venezuela in 2010, and intended to sell only 100% – not a part – of its interest. [Head Testimony (Vol. VIII – 1728:18-22); Edmiston Testimony (Vol. IV – 797:25-800:6, 813:10-20, 816:21-817:14, 847:12-848:5, 849:16-23, 849:11-850:24); Trial Ex. A73; Trial Ex. B15]

30.     In the auction, the selling parties, here Harvest (US) and Branta E&P, controlled the auction's rules for bidding and the identities and number of competitors allowed to participate in the auction. The sellers and their banker (Bank of America Merrill Lynch ("BAML")) controlled the market of participating competitors by choosing whom to invite into the process, including sending the initial "teaser" and making follow-up calls to generate interest in the auction, offering confidentiality agreements and allowing access to the sellers' "data room," and sending bid guidelines describing the terms of bids. A party not invited to participate or barred from participation by the sellers was not a competitor in the auction. [Nesselrode Testimony (Vol. IV – 737:17-19, 743:1-5, 789:9-21, 780:12-15); Edmiston Testimony (Vol. IV – 817:15-819:15, 825:18-827:10, 839:25-840:9, 849:16-23, 851:9-22, 862:19-24); Sooby Testimony (Video   Depo. – 118:6-119:4); Tresca Testimony (Vol. III – 583:7-11, 583:16-19, 667:10-20); Trial Ex. 5;   Trial Ex. 7; Trial Ex. B15 at B15_0003, 0005]

31.     Branta agreed in early January 2011 to participate as a seller with the Harvest Entities, agreed that HNR could act as a representative for both Branta Entities in the auction, and agreed to BAML's participation on behalf of the Branta Entities in the auction process. [Tresca Testimony (Vol. III – 575:9-576:5, 583:2-19, 644:21-645:7); Trial Ex. 30; Trial Ex. 52]

32.     Plaintiffs expected that Newfield, Shell or El Paso would be the primary competitors in the auction. [Tresca Testimony (Vol. III – 601:1-4, 604:17-605:1, 676:24-677:6); Head Testimony (Vol. VIII – 1732:14-1733:5); Trial Ex. 77] They expected El Paso to be the  most logical company to make a strong bid. [Trial Ex. K] Branta was aware, however,

13

that Ute Energy could not afford to purchase the Uinta Basin Assets in their entirety.  [Trial Exs. Q, T]

### a. <u>Plaintiffs Barred Newfield and Ute Energy From The Auction</u>

33.    On January 6, 2011, HNR's CEO, James Edmiston, informed Branta's Fred Tresca that Ute Energy and Newfield would be excluded from the auction process, at least until a later point in the process.  [Trial Ex. A43 at A43_003]

34.    On January 7, 2011, Edmiston instructed BAML that Ute Energy and Newfield would not be permitted to participate in the auction unless and until he instructed BAML otherwise.  [Trial Ex. 18 at 18-024; Sooby Testimony (Video Depo. – 60:24-62:18, 70:22-71:8, 72:7-15); Edmiston Testimony (Vol. IV – 853:14-855:18)]  Mr. Edmiston instructed BAML to move Newfield and Ute Energy to the "B-List."  [Trial Ex. 18 at 18-024]  BAML understood Mr. Edmiston's instructions to bar Ute Energy and Newfield from participating in the auction unless and until Plaintiffs affirmatively lifted their respective bars.  [Sooby Testimony (Video Depo. – 67:12-69:12, 70:22-71:8, 74:2-11, 77:01-12, 92:14-94:22, 97:19-98:4)]

35.    On January 10, 2011, BAML began a calling program contacting potential buyers about the auction.  [Trial Ex. 18]  Potential buyers were also sent "teasers" that described the assets to be sold as well as the next steps in the sale process, which involved the execution of a confidentiality agreement, access to an online data room, and management presentations in Houston covering Land, Geology, Geophysics, Reservoir Engineering and Economics, Operations, and Facilities and Marketing.  [*Id.*; Trial Ex. A76]

36.    BAML's Contact List records that BAML contacted 47 different companies in its calling program and sent Teasers to 45 companies.  [Trial Ex. 18]  The Contact List shows that BAML never sent a Teaser to Newfield or Ute Energy, and never contacted Ute Energy in its calling program.  [*Id.*]

37.     On January 13, 2011, Mr. Jaggers called HNR's vice president, Karl Nesselrode, to express interest in the Uinta Basin Assets. [Jaggers Testimony (Vol. I – 99:21-100:14, 132:2-5)] Mr. Nesselrode testified that Mr. Jaggers expressed interest in participating in the process and that he told Mr. Jaggers that if Ute Energy were interested it needed to contact BAML. [Nesselrode Testimony (Vol. IV – 752:10-16, 754:7-22, 755:14-756:9, 793:3-11)]

38.     However, in an email sent at 11:15 p.m. on the same day that Mr. Nesselrode spoke to Mr. Jaggers and reported his conversation with Mr. Jaggers to Mr. Edmiston, Mr. Edmiston reiterated his instruction to Mr. Nesselrode and BAML that "Ute Energy and Newfield are barred from the early rounds of our process due to competitive reasons." Mr. Edmiston stated "[i]f I think we need to, we will bring them in at the end . . . ." [Trial Ex. 57; Nesselrode Testimony (Vol. IV – 746:5-748:5)]

39.     Mr. Nesselrode testified that, later in January 2011, he received two other calls from Mr. Jaggers expressing Ute Energy's interest in being part of the process relating to the Uinta Basin Assets and seeking information regarding the status of the data room. [Nesselrode Testimony (Vol. III – 696:17-697:1, 697:18-25; Vol. IV – 753:20-23, 758:14-759:8)]

40.     Mr. Nesselrode indicated that he and Mr. Jaggers did not discuss bidding on any of the January phone calls regarding Ute Energy's interest in participating in the process relating to the Uinta Basin Assets because it was too early in the process to talk about bidding. [Nesselrode Testimony (Vol. IV – 758:1-13)]

   **b.   Plaintiffs Lifted The Bar On Newfield's Participation In the Auction On February 15, 2011 But Never Lifted The Bar On Ute Energy's Participation**

41.     On February 15, 2011, just three weeks before the auction, Mr. Edmiston decided to allow Newfield to participate in the auction and instructed BAML to invite Newfield to

participate. However, Mr. Edmiston never lifted the bar on Ute Energy's participation in the auction and never instructed BAML to contact Ute Energy about participating in the auction. [Sooby Testimony (Video Depo. – 74:2-76:1, 77:1-18, 78:6-10, 79:22-80:10, 80:20-81:1, 94:17-22); Trial Ex. 90; Tresca Testimony (Vol. III – 668:13-669:21, 670:9-15); Edmiston Testimony (Vol. IV – 857:6-19, 857:24-858:4, 858:25-859:8); Head Testimony (Vol. VIII – 1738:10-19)]

42.     Harvest also barred Morgan Stanley from the auction process. [Trial Ex. B12]

43.     BAML invited Newfield into the process on February 15, 2011 by contacting Newfield's CFO, Terry Rathert, and sending a confidentiality agreement for Newfield to execute, and by inviting Newfield to schedule a visit to the data room. [Trial Exs. A95, A98, 91-92; Edmiston Testimony (Vol. IV – 856:11-14, 856:22-24)]

44.     Plaintiffs did not expect companies to bid without first executing a confidentiality agreement, accessing the data room, and receiving bid procedures. Ute Energy would not have bid in the auction without first accessing the data room. [Jaggers Testimony (Vol. I – 199:1-13, 201:11-14); Jaggers Testimony (Vol. II – 257:19-258:1, 261:10-13); Nesselrode Testimony (Vol. IV – 709:13-21, 711:7-14, 758:3-10, 780:8-15); Edmiston Testimony (Vol. IV – 851:9-852:5); Sooby Testimony (Video Depo. – 21:12-19, 22:08-19, 68:9-20); Tresca Testimony (Vol. III – 667:25-668:12); Head Testimony (Vol. VIII – 1732:24-1733:6)]

45.     BAML's Contact List reflects that BAML sent confidentiality agreements to 21 companies, and hosted 10 data room presentations. [Trial Ex. 18] The Contact List identifies the companies visiting the data room as El Paso, Devon, Shell, Endeavour, Bill Barrett Corporation ("BBC"), Newfield, ExxonMobil, Enduring Resources, ConocoPhillips, and Berry Petroleum. [*Id.*]

46.     Plaintiffs never sent Ute Energy a confidentiality agreement and never invited Ute Energy to the data room, which contained proprietary information from which potential bidders

could evaluate the Uinta Basin Assets. [Edmiston Testimony (Vol. IV – 851:9-853:6, 855:3-856:4, 857:8-11, 857:24-858:5, 858:25-859:3); Head Testimony (Vol. VIII – 1730:13-1731:2, 1731:16-1732:5); Nesselrode Testimony (Vol. IV – 751:24-752:9, 752:20-753:18); Trial Ex. C38 at C38_0021-22, at Request for Admission # 5; Trial Ex. 18; Sooby Testimony (Video Depo. – 77:1-18, 77:23-78:10, 78:15-17, 78:19)]

47.     Neither Plaintiffs nor BAML ever contacted Ute Energy after Mr. Edmiston sent his January 13, 2011 email reiterating that Ute Energy was barred from participating in the auction. [Trial Ex. 18; Nesselrode Testimony (Vol. IV – 751:24-752:9, 752:20-753:18); Sooby Testimony (Video Depo. – 79:5-8, 79:10-80:10, 82:4-10, 83:6-23, 92:14-93:14, 93:17-94:4, 94:12-22)]

48.     There is no evidence that anyone from HNR, Branta, or BAML expressed surprise that Ute Energy was not in the process or asked why Ute Energy was not involved. Instead, they reported that the data room attendees included "everyone you would expect." [Trial Ex. A96] There is no evidence Plaintiffs or their bankers expected Ute Energy to participate in the auction process.

### c.  Newfield Executed A Confidentiality Agreement With HNR And Entered Into An Amendment To The Branta CA

49.     On February 17, 2011, Newfield and HNR entered into a confidentiality agreement  (the "Harvest Confidentiality Agreement" or "Harvest CA"), so that Newfield could access the  data room and gather information to prepare a bid for Harvest (US)'s share of the Uinta Basin  Assets. [Trial Ex. 32]

## VI.   NEWFIELD DEVELOPS ITS BID PRESUMING ROBUST COMPETITION

50.     The auction for the Uinta Basin Assets was a sealed bid process, in which bidders  did not know the identities or bid amounts of other bidders, or the number of other bidders. [Schulman Testimony (Vol. VI – 1142:22-1143:12); Burtis Testimony (Vol. X –

17

1921:1-21)]

51.     Newfield did not know the number or identities of the potential bidders contacted by BAML.  Newfield believed, however, that there would be robust competition in the auction from numerous bidders.  [Trial Ex. 9 at 9-065; Packer Testimony (Vol. VII – 1416:7-21, 1467:13-1469:12, 1495:24-1496:22, 1534:17-20, 1543:24-1544:9); Massaro Testimony (Vol. VIII – 1567:5-14, 1574:9-18, 1604:1-6, 1629:20-24); Jergensen Testimony (Vol. V – 1020:20-24, 1027:13-24, 1029:24-1030:20); Rathert Testimony (Vol. IX – 1774:3-1775:7); Boothby Testimony (Vol. VIII – 1688:5-1690:5); Howard Testimony (Vol. II – 384:12-385:5]

52.     For example, Newfield's Decision Review document that was presented internally  to Newfield's senior management identified El Paso, Shell, Oxy, Noble and Samson as "well-  capitalized—could move the needle" potential bidders.  Ute Energy, along with BBC, Berry, and  QEP, was identified in this document in the list of potential bidders that were "also active in the  basin" but from which Newfield "expected lower level activity," along with Crescent Point Energy, a Canadian company that ultimately purchased Ute Energy's upstream business.  [Trial  Ex. 9 at 9-065; Jaggers Testimony (Vol. I – 191:14-16); Howard Testimony (Vol. II – 425:17-20);  Massaro Testimony (Vol. VIII – 1567:5-14, 1574:9-18, 1581:20-1582:15]

53.     Bigger players such as El Paso were considered the primary competitors Newfield thought it would need to beat to win  the auction.  [Trial Exs. 112, 117, 118, 120, 124; Howard Testimony (Vol. II – 368:11-15,  384:15-385:5, 421:7-19); Packer Testimony (Vol. VII – 1468:3-8, 1468:25-1469:12); Massaro  Testimony (Vol. VIII – 1567:10-14, 1574:9-16, 1577:18-23, 1582:12-15, 1604:1-6); Boothby   Testimony (Vol. VIII – 1689:5-13, 1732:14-19); Rathert Testimony (Vol. IX – 1774:25-1775:7)]

54.     Though Newfield identified Ute Energy as a potential competitor, Newfield never

thought Ute Energy was the primary competitor it would have to beat to win the auction. [Howard Testimony (Vol. II – 421:7-19)] This is because it was widely known that Ute Energy had limitations on its ability to fund a transaction, as evidenced by discussions Ute Energy had had with Newfield as to whether it could keep up with Newfield's drilling capital campaigns. [Packer Testimony (Vol. VII – 1469:22-24); Jergensen Testimony (Vol. V – 1027:13-1028:12); Jaggers Testimony (Vol. I – 136:9-13)]

55. According to Ute Energy's CEO, Mr. Jaggers, Ute Energy was not a natural buyer for the Uinta Basin Assets because the only way Ute Energy could participate was if Newfield acquired the assets and then shared them with Ute Energy. [Jaggers Testimony (Vol. I – 203:5- 14); Tresca Testimony (Vol. III – 608:8-15)]

56. The Decision Review document presented to Newfield's senior management recommended a bid of $220 million. [Trial Ex. 9 at 9-064; Howard Testimony (Vol. II – 374:4-13)] Newfield's initial bid was approximately $67.5 million higher than the recommended bid because Newfield anticipated robust competition. [Massaro Testimony (Vol. VIII – 1593:20-1596:12); Packer Testimony (Vol. VII – 1473:21-1475:16, 1525:7-1526:11, 1543:24-1544:9)]

## VII. NEWFIELD IS THE SUCCESSFUL BIDDER

57. On March 1, 2011, BAML sent bid procedures to Newfield and eight other potential bidders for the purchase of Harvest (US)'s share of the Uinta Basin Assets and for the purchase of Branta E&P's share of the Uinta Basin Assets. [Trial Ex. 18; Trial Ex. B15] No bid procedures were sent to Ute Energy. [*See id.*]

58. The bid procedures instructed the bidders to submit their proposals "in conformity with the guidelines" set forth in the procedures. The guidelines required that any bid be for all of Harvest (US)'s and Branta E&P's Uinta Basin Assets, respectively. [Trial Ex. B15 at B15_0004, B15_0008]

59.     Plaintiffs always intended to sell 100% of the Uinta Basin Assets, not portions thereof, if possible.  [Tresca Testimony (Vol. III – 644:7-20); Edmiston Testimony (Vol. IV – 816:21-817:14, 847:12-848:5, 848:16-24, 849:11-20, 850:10-24); Sooby Testimony (Video Depo.-- 47:19-48:1; Trial Exs. A73, 104]  In fact, Harvest (US), through Mr. Edmiston, was contacted  by several smaller companies regarding partial bids, but Mr. Edmiston rejected their overtures,  wanting 100% of the assets to be available in the auction.  [Edmiston Testimony (Vol. IV –  848:16-24); Trial Ex. A73]  And, in the end, Plaintiffs rejected BBC's partial bid at $180 million.  [Trial Ex. 13]  Harvest never told its bankers, BAML, that they would entertain partial bids, and  never invited partial bids.  [Nesselrode Testimony (Vol. IV – 735:2-12, 735:23-736:7)]

60.     Ute Energy understood that Plaintiffs were interested only in selling the entirety of their Uinta Basin Assets, but Ute lacked the financial ability to compete for those assets.  [Jaggers Testimony (Vol. I – 189:2-7)]

61.     Plaintiffs' position was that selling the whole portion of the assets would maximize the value or price they could receive—the whole being greater than the sum of the parts—and  therefore that they wanted to sell the entirety of the Uinta Basin Assets together at the auction.  [Tresca Testimony (Vol. III – 644:17-20)]

62.     At trial, Mr. Jaggers testified that he might have approached Harvest (US) outside the auction process regarding a partial bid since Ute Energy could not compete for the entirety of the assets in the auction.  [Jaggers Testimony (Vol. I – 114:18-20, 189:2-13)]  But there was no evidence of what portion Ute Energy would have bid on, nor the price it would have paid, nor any  other details.  Therefore, Mr. Jaggers' testimony was speculative.  Moreover, based on the evidence that Mr. Edmiston rejected all expressions of interest in partial offers made outside the auction process, I find no reason to believe that an overture from Ute Energy expressing interest in making a partial offer prior to the auction would have been more positively received.  And

because the nature of such a partial offer was never considered by Ute Energy, it would also be speculative to predict even what that offer would have been.

63. The Decision Review document recommending a $220 million bid was prepared by Newfield's Rocky Mountain business unit, for presentation to Newfield's senior management, which was responsible for discussing bids for significant acquisitions and the amounts of such bids, with final decisions made by Newfield's CEO, Lee K. Boothby. [Boothby Testimony (Vol. VIII – 1672:23-1673:11, 1675:8-1676:8, 1684:2-1685:22); Howard Testimony (Vol. II – 277:10-278:3, 342:16-343:6, 374:4-13, 383:25-384:9); Massaro Testimony (Vol. VIII – 1592:19-1596:12)]

64. The Newfield bid of approximately $287.5 million was decided by Mr. Boothby, based on his determination that the maximum amount he was willing to pay for the Uinta Basin Assets was $300 million, and he wanted to submit a bid somewhat below the maximum to leave room for possible further negotiations. [Boothby Testimony (Vol. VIII – 1684:21-1686:13); Massaro Testimony (Vol. VIII – 1593:20-1596:12)]

65. On March 7, 2011, the bid deadline, Newfield submitted a bid for more than $196 million for Harvest (US)'s share of the Uinta Basin Assets and a bid for more than $90 million for Branta E&P's share of the Uinta Basin Assets, for a total bid of $287,575,000. [Trial Ex. 127; Trial Ex. 128].

66. BBC initially submitted a bid for $120 million for a portion of Harvest (US)'s share of the Uinta Basin Assets. [Nesselrode Testimony (Vol. IV – 728:18-20); Trial Ex. 13 at 13-003]

67. On March 10, 2011, BBC submitted a bid for $50 million for a portion of Branta E&P's share of the Uinta Basin Assets and an amended bid for $130 million for a portion of Harvest (US)'s share of the Uinta Basin Assets. [Trial Ex. 135; Trial Ex. 136]

68.     Following Newfield's March 7, 2011 bid, BAML comments to Newfield caused  Newfield to believe there were competitive bids for the entirety of the Uinta Basin Assets and a  partial bid for an unspecified part of the Uinta Basin Assets in "the North." [Trial Ex. B41;  Massaro Testimony (Vol. VIII – 1598:7-1599:7, 1603:1-19, 1604:1-6)]

69.     However, Newfield did not know how many other bidders there were, their identities, their bid amounts, or the scope of the partial bid that was reported to them. [Massaro  Testimony (Vol. VIII – 1603:1-19, 1604:1-6)]

70.     The Branta Entities did know the identities of the other bidders as well as the bid amounts.  Before Newfield's bid was accepted, Branta and/or Branta E&P used their knowledge of Newfield's bid to propose to Morgan Stanley that it finance Branta in making a bid for Harvest (US)'s 70% share of the Uinta Basin Assets.  Branta told Morgan Stanley that, based on the bids, it looked like it would take $310 million to win the auction.  [Trial Ex. B44 at B44_0004; Tresca Testimony (Vol. III – 583:20-584:2, 663:2-22, 664:6-665:2)]  Morgan Stanley declined to finance Branta, stating that the $310 million price tag was "too pricey."  [Trial Ex. B44 at B44_0002]

71.     Between March 7 and March 11, 2011, Plaintiffs requested, through BAML, and by communications between Mr. Edmiston and Newfield's COO Gary Packer, that Newfield increase its combined bid slightly, suggesting that, if Newfield did so, it would be the high bidder. [Trial Ex. 13 at 013-003; Sooby Testimony (Video Depo. – 133:9-19, 144:6-22); Edmiston Testimony (Vol. IV – 839:14-21, 877:18-878:9, 881:3-23); Massaro Testimony (Vol. VIII – 1603:1-19, 1604:1-6)]

72.     Newfield agreed to raise its bid to $295 million, to which Plaintiffs agreed. [Massaro Testimony (Vol. VIII – 1600:23-1601:2)]  Newfield then requested "exclusivity," meaning that the Harvest Entities and Branta Entities would negotiate exclusively with Newfield for a period of 9 days to reach a definitive purchase and sale agreement.  Plaintiffs demanded $15

million in exchange for exclusivity, and Newfield agreed, thereby making the total bid $310 million, comprised of $295 million for the Uinta Basin Assets and $15 million for exclusivity. [Trial Exs. B41, B46, B47, B48, 13 at 13-003; Edmiston Testimony (Vol. IV – 877:14-882:16); Massaro Testimony (Vol. VIII – 1599:24-1602:17, 1603:16-19, 1604:7-9, 1604:15-1605:3)]

73.     No other companies besides Newfield and BBC bid in the auction.  [Edmiston Testimony (Vol. IV – 836:23-837:16, 872:18-873:7, 877:5-13); Sooby Testimony (Video Depo. – 114:5-11); Nesselrode Testimony (Vol. IV – 725:21-726:2, 728:2-6, 729:13-20)]

74.     Harvest (US) and Branta E&P accepted Newfield's March 11, 2011 bids for a combined $310 million, with an agreement for exclusive negotiations for 9 days.  [Trial Ex. B46  at B46_0003 ¶ F; Trial Ex. B45 at B45_0003 ¶ F]

75.     On March 21, 2011, Newfield entered into two separate Purchase and Sale Agreements ("PSAs"), one with Harvest (US) and one with Branta E&P.  Pursuant to those two  agreements, Newfield agreed to pay Harvest (US) and Branta E&P a combined total of $308  million for the Uinta Basin Assets -- $215 million for Harvest's interests and $93 million for  Branta E&P's interests.  [Trial Ex. B67; Trial Ex. B68; Tresca Testimony (Vol. III – 597:14-  598:1); Nesselrode Testimony (Vol. IV – 782:18-785:2)]

76.     On March 22, 2011, HNR issued a press release publicly announcing the sale of Harvest's 70% interest in the Uinta Basin Assets to Newfield for $215 million and the expectation  that the deal would close in May 2011.  [Trial Ex. B69]

77.     HNR also attached a copy of the executed PSA, including the PSA's appendix, to  its March 25, 2011 Form 8-K filing with the Securities and Exchange Commission. [Edmiston  Testimony (Vol. IV – 894:8-895:1)]

78.     Pursuant to Section 10.12(a) of the PSAs between Newfield and Harvest (US) and Branta E&P, respectively, the Branta CA and Harvest CA terminated on May 17, 2011.  [Trial

Ex. B67 at B67_0043; Trial Ex. B68 at B68_0042-43; Howard Testimony (Vol. II – 456:10-14)]

79.     Newfield did not offer Ute Energy an option to acquire any of the interests acquired in the Rocky Point EDA.  [Howard Testimony (Vol. II – 436:16-437:15); Jaggers Testimony (Vol. I – 153:5-10; 154:14-19)]

## VIII.    THERE WAS NO AGREEMENT BETWEEN NEWFIELD AND UTE ENERGY  THAT UTE ENERGY NOT PARTICIPATE IN THE AUCTION

80.     There was no credible evidence presented at trial of an agreement between Newfield and Ute Energy that Ute  Energy would not participate in the Auction in return for compensation from Newfield, as alleged  by Plaintiffs in their complaint.

81.     I also find that there is no credible evidence, as alleged by Plaintiffs, that an agreement was entered into by  Daryll Howard and Mr. Jaggers during a telephone call that took place on January 13, 2011 that Ute Energy would not participate in the  bidding for the Uinta Basin Assets in return for remuneration from Newfield.

### a.    It Was Premature For Newfield And Ute Energy To Be Talking  About  Bidding On January 13, 2011

82.     Though Plaintiffs claim that, on January 13, 2011, Newfield and Ute Energy agreed that Ute Energy would not bid on the Uinta Basin Assets, Plaintiffs had not yet announced at that time that they would be auctioning the Uinta Basin Assets.  [Jaggers Testimony (Vol. II – 267:14-268:21)]

83.     And even if Newfield and Ute Energy had been informed by then of the upcoming auction, it still would have been premature to discuss bidding.  Bidding was the last step in a lengthy, multi-step process to obtain access to and evaluate information regarding the Uinta Basin Assets and then to formulate a bid.  As Plaintiffs acknowledged, the process included BAML sending a "teaser" to potentially interested parties, interested parties negotiating and executing a confidentiality agreement, interested parties being invited to and attending the data room to

review information regarding the Uinta Basin Assets, and interested parties being send bid procedures and invited to bid on the assets. [Trial Ex. 18; Edmiston Testimony (Vol. IV – 818:9-819:15); Nesselrode Testimony (Vol. IV – 714:4-19); Sooby Testimony (Video Depo. – 21:12-19, 22:8-19, 74:2-75:3); Howard Testimony (Vol. II – 410:8-411:5)]

84.    On January 13, 2011, neither Ute Energy nor Newfield had been contacted about the forthcoming auction or sent a teaser.

85.    Instead, Ute Energy had just been informed that Harvest was contemplating a sale of its assets and, in Mr. Jaggers' call with Mr. Nesselrode, learned that a data room was not even open yet for interested parties to begin evaluating the assets. [Jaggers Testimony (Vol. I – 169:16-25)]

### b.  The January 13, 2011 Phone Call

86.    The evidence shows Mr. Jaggers called Mr. Howard on January 13, 2011 to inquire whether Newfield might be interested in acquiring the Uinta Basin Assets, which it was. [Jaggers Testimony (Vol. I – 137:3-8, 169:21-22)]

#### i.  Mr. Jaggers' Recollection Of The January 13, 2011 Call

87.    Mr. Jaggers and Mr. Howard then discussed Mr. Jaggers' belief that there were AMIs in place such that it would not make sense for Ute Energy to participate because of the AMIs and Ute Energy's lack of technical staff. [Jaggers Testimony (Vol. I – 138:8-13, 139:25-140:10)]

88.    Mr. Jaggers testified that Mr. Howard did not ask Ute Energy not to participate during that phone call. [Jaggers Testimony (Vol. I – 140:14-15)] And Ute Energy did not agree with Newfield that Ute Energy would not participate in any other aspect of the process. [Jaggers Testimony (Vol. I – 166:3-5)]

89.    Mr. Jaggers testified that he and Mr. Howard did not even discuss bidding.

[Jaggers Testimony (Vol. I – 183:3-17); Jaggers Testimony (Vol. II – 261:24-262:10)]

90. Mr. Jaggers further testified that there was no agreement not to bid, outside of the parties' AMIs [Jaggers Testimony (Vol. I – 165:23-166:2, 169:7-15, 174:6-175:2, 183:3-17, 208:25-209:22); Jaggers Testimony (Vol. II – 261:24-262:19)], and no agreement that Ute Energy would receive any compensation in return for not bidding.  [Jaggers Testimony (Vol. I – 183:3-17)]

91. Rather, Mr. Jaggers testified that he and Mr. Howard both misunderstood the scope of the Rocky Point AMI, and so discussed on the January 13, 2011 call that the AMIs would apply to the Uinta Basin Asset acquisition such that Ute Energy would be able to participate in the acquisition if Newfield was successful in acquiring the assets.  [Jaggers Testimony (Vol. I – 168:15-169:2)]

92. While Plaintiffs have pointed to testimony from Mr. Jaggers that he and Mr. Howard had discussions "regarding the AMI and agreed not to bid" [Jaggers Testimony (Vol. I – 165:17-22)], and concluded that Newfield would be the bidder [Jaggers Testimony (Vol. I – 223:14-21)], Mr. Jaggers clarified, upon further examination, that there was no agreement beyond the AMIs, and that there was no discussion of bidding specifically on the January 13, 2011 call. Any understanding regarding who would bid was derived from the normal way an AMI would operate.  [Jaggers Testimony (Vol. I – 223:18-19); Jaggers Testimony (Vol. II– 261:24-262:19)] As discussed in detail below, I find credible Mr. Jaggers' testimony that he did not enter into any agreement with Newfield on the January 13, 2011 call, and that any understanding as to the Uinta Basin Asset process arose solely from the parties' understanding of their AMIs.

93. There is no evidence that Mr. Jaggers ever told anyone on his team at Ute Energy or its investors that Ute Energy had an agreement with Newfield that it would not bid or otherwise  participate in the auction for the Uinta Basin Assets on the January 13, 2011 call.

ii. <u>Mr. Howard's Recollection Of The January 13, 2011 Call</u>

94.     Mr. Howard's testimony confirmed Mr. Jaggers' recollection of the January 13, 2011 phone call.

95.     Mr. Howard testified that he learned for the first time on the January 13, 2011 call that the Uinta Basin Assets might be for sale. [Howard Testimony (Vol. II – 409:18-20)] He confirmed that he believed it was too early in the process to be talking about bidding; rather, this was a very quick call right after learning that the Uinta Basin Assets might be sold. [Howard Testimony (Vol. II – 417:8-14)]

96.     Like Mr. Jaggers, Mr. Howard testified that there was no discussion about bidding on the assets during the January 13, 2011 telephone call. [Howard Testimony (Vol. II – 316:12- 18, 317:9-13, 409:21-23, 410:3-7)]

97.     Mr. Howard confirmed that because it was too early in the process to be talking about bidding, they were merely discussing that Harvest would be selling its Utah assets and that there were AMIs between Newfield and Ute Energy that covered the area. [Howard Testimony (Vol. II – 409:21- 410:2, 411:6-14)]

98.     Mr. Howard thus confirmed that he never asked Mr. Jaggers and Ute Energy not to make a bid on the Uinta Basin Assets [Howard Testimony (Vol. II – 415:13-18, 417:4-7)], and that they reached no agreement that Ute Energy would not bid on the Uinta Basin Assets [Howard Testimony (Vol. II – 316:12-18, 404:7-405:4, 415:4-18, 417:4-7, 417:15-23, 442:3-8)], or that Newfield would provide any compensation to Ute Energy in return for Ute Energy not bidding. [Howard Testimony (Vol. II – 417:15-19)]

99.     Mr. Howard never informed his boss, Mr. Packer, that he had reached an agreement with Mr. Jaggers. [Packer Testimony (Vol. VII – 1441:14-20)] Indeed, Mr. Howard understood that he would not have been authorized to enter into any such agreement. [Howard

Testimony (Vol. II – 419:8-13)]

100.    And there is no evidence that Mr. Howard informed anyone else at Newfield that he and Mr. Jaggers had agreed on the January 13, 2011 telephone call that Ute Energy would not bid or otherwise participate in the auction.

### iii.    Later Communications Confirm No Agreement Was Reached By Newfield and Ute Energy On January 13, 2011

101.    I find that evidence regarding later communications and conduct supports the testimony of Mr. Howard and Mr. Jaggers that there was no agreement reached on January 13,  2011 regarding Ute Energy's participation in the auction.

102.    As already described above, there was no evidence presented at trial that either Mr. Howard or Mr. Jaggers informed anyone else about any supposed agreement regarding bidding.  [FF # 93, 99-100]

103.    Instead, on January 30, 2011, two weeks after the supposed agreement that Ute Energy would not bid and would be remunerated by receipt of a share of the assets beyond its entitlement under the AMIs, Mr. Howard proposed to Newfield's management just that – that if Newfield were successful in acquiring the Uinta Basin Assets, it would share with Ute Energy even when not required to do so under the AMIs.  Mr. Howard's boss, Mr. Packer, responded "first things first. . ." and directed Mr. Howard to focus first on obtaining access to the Harvest data room.  [Trial Ex. 80]  This confirms both that Mr. Howard had not communicated to Newfield's management that he had reached an agreement with Ute Energy and that Newfield did not perceive that it already had an agreement to share the Uinta Basin Assets with Ute Energy other than pursuant to the terms of the AMIs.

104.    Similarly inconsistent with the existence of a bid-rigging agreement is Newfield's continued treatment internally of Ute Energy as a potential competitor in the auction.  For

example, Mr. Howard and his team consistently communicated internally, including to management, that Ute Energy was a competitor of Newfield's. [Packer Testimony (Vol. VII – 1451:8-23); Trial Ex. 9 at 9-065]

105. Ute Energy similarly did not behave as if it already had agreed that it would not participate in the auction process or bid as of January 13, 2011.

106. For example, Mr. Jagger placed two calls to Mr. Nesselrode in the second half of January 2011, after the supposed agreement was reached. Mr. Nesselrode confirmed that, during those conversations, Mr. Jaggers continued to express Ute Energy's interest in participating in the process. [Nesselrode Testimony (Vol. III – 696:17-697:1, 697:18-25; Vol. IV – 753:20-23, 758:14-759:8)] I find such continued expressions of interest by Ute Energy in participating in the sale process incompatible with Ute Energy having agreed not to participate in the process.

107. Another example is an email from Ute Energy's Todd Kalstrom to Kelly Donohoue of Newfield on January 19, 2011, a mere six days after the call. In that email, Mr. Kalstrom stated that Mr. Howard and Mr. Jaggers "have talked about reviewing the Harvest divestiture package." [Trial Ex. 67] Far from relaying that his boss had informed him that Ute Energy had reached an agreement with Newfield that Ute Energy would not participate in the auction, Mr. Kalstrom relayed only that he had been informed that Mr. Jaggers and Mr. Howard had spoken about the diligence process.

108. And on March 4, 2011, Mr. Jaggers sent an email to Newfield noting that the "7th is almost here" and asking if Newfield "was planning to submit a bid on Monday," an inquiry that is inconsistent with a preexisting agreement that Newfield would bid and not Ute Energy, as Plaintiffs allege. [Trial Ex. 115]

iv.  Any Understanding That Came Out Of The January 13, 2011 Call
Related  To The Application Of The Parties' AMIs

109.    I find that, to the extent Newfield and Ute Energy had any understanding between them coming out of the January 13, 2011 call, it was not an agreement regarding bidding or participation in the process.  Rather, it was that the AMIs applied and that each would act pursuant to the parties' AMIs, or their understandings thereof.  [Packer Testimony (Vol. VII – 1492:8-13); Jaggers Testimony (Vol. I – 175:1-9); Jaggers Testimony (Vol. II – 262:11-19); Howard Testimony (Vol. II – 320:22-321:6, 442:5-8)]

110.    Mr. Jaggers testified that he expected that if anyone would make a bid it would be  Newfield, and not Ute Energy, and that this expectation was based on the AMIs, not on any discussion regarding who would bid.  [Jaggers Testimony (Vol. II – 262:11-19)]

111.    Plaintiffs attempted to discredit the testimony regarding a mutual misunderstanding of the AMIs being the focus of the January 13, 2011 call by arguing that the Rocky Point AMI's language was clear and that Newfield misled Ute Energy regarding its scope  in the January 13, 2011 conversation.  I find no credible evidence to support Plaintiffs' theory, nor do I  find it material when evaluating whether a bid-rigging agreement was made.

112.    Rather, Mr. Jaggers testified that he was unaware on January 13, 2011 that the Rocky Point AMI would not cover the assets acquired in the auction.  [Jaggers Testimony (Vol. I– 138:11-13, 224:22-225:2)]

113.    As detailed above, the Rocky Point AMI had been amended by the December 20, 2010 Letter Agreement [Trial Ex. 29], but Mr. Jaggers testified that he was not "aware that it had been amended until some point between January and May" 2011.  [Jaggers Testimony (Vol. I – 224:22-225:1)]  Mr. Jaggers testified further that he only discovered the Rocky Point AMI had been amended to exclude assets like the Uinta Basin Assets sometime in February or March 2011,

when the Ute Energy employee who had actually executed it informed him of the change. [Jaggers Testimony (Vol. I – 225:7-10)] I find Mr. Jaggers' testimony regarding the timing of his knowledge regarding the scope of the Rocky Point AMI credible.

114. Dr. Schulman, Plaintiffs' expert, testified that he had no reason to disbelieve Mr. Jaggers' testimony that, at the time of the alleged agreement, he believed that the AMIs would give Ute Energy the opportunity to participate. [Schulman Testimony (Vol. VI – 1156:22-1157:4)]

115. Mr. Howard expressed on the call his belief that the AMIs applied, and was unaware of the limitations in the coverage of the Rocky Point AMI, at the time of the January 13, 2011 call. [Howard Testimony (Vol. II – 309:20-25, 312:8-13, 411:10-14, 414:8-10, 430:11-14) Trial Ex. 61; Trial Ex. 76]

116. Mr. Howard continued to believe thereafter that the Rocky Point AMI covered this transaction, as evidenced by a January 15, 2011 email from Mr. Howard stating that Newfield had "an AMI on RP and Bridgeland but not MD [*sic*] EDA." [Trial Exs. 61, 76; Howard Testimony (Vol. II – 430:11-14); Donohoue Testimony (Vol. V – 1064:10-1065:8)]

117. Indeed, though Mr. Howard had signed the Rocky Point AMI on December 20, 2011, he was not aware that it excluded the acquisition of the Uinta Basin Assets until late January, when Ms. Donohoue, Newfield's former land manager for the Rocky Mountain region, discovered Mr. Howard's misunderstanding of the Rocky Point AMI. At that time, as Ms. Donohoue testified, Mr. Howard asked her to help clear up his misunderstanding by preparing a memo summarizing each of the AMIs and Newfield's obligations thereunder. [Donohoue Testimony (Vol. V – 1043:13-15, 1064:10-1065:8); Trial Ex. 76]

118. I find that it is not unreasonable that Mr. Howard was not aware of the limited scope of the sharing obligations under the Rocky Point AMI, despite having executed it,

because, as a senior executive, Mr. Howard did not read every detail of every document he signed. [Howard Testimony (Vol. II – 413:8-16)]

119. I find that Mr. Howard's belief at the time of the January 13, 2011 phone call that the Rocky Point AMI would cover the Uinta Basin Asset transaction was genuine. [Howard Testimony (Vol. II – 413:8-16, 414:8-10)]

120. I also do not find that Newfield misled Ute Energy by failing to affirmatively disclose the plain language of the Rocky Point AMI once Mr. Howard became aware that it would not cover the Uinta Basin Asset acquisition. It is undisputed that the language is clear and unambiguous and so equally accessible and understandable to Ute Energy as to Newfield. Moreover, Mr. Howard had no reason to call Mr. Jaggers to highlight the plain language of the Rocky Point AMI because Newfield remained undecided until May 2011 as to whether it would share acquired assets irrespective of the limitations in the Rocky Point AMI. [Howard Testimony (Vol. II – 435:15-437:5); Packer Testimony (Vol. VII – 1483:16-1484:2)] Furthermore, the Harvest CA precluded such a conversation starting on February 17, 2011. [Trial Ex. 32]

### c. **The May 20, 2011 Letter From Mr. Jaggers To Mr. Howard**

121. Plaintiffs also have pointed to a May 20, 2011 letter, Trial Exhibit 1, as evidence of an agreement between Newfield and Ute Energy regarding bidding in the auction.

122. The May 20, 2011 letter states that Mr. Howard asked Ute Energy "not to be involved because the existing AMIs would cover the division of interest." [Trial Ex. 1] Mr. Jaggers, however, does not recall that Mr. Howard ever made this request. [Jaggers Testimony (Vol. I – 184:8-18)]

123. The May 20, 2011 letter does not state that Newfield and Ute Energy *agreed* that Ute Energy would not bid in the auction. [Trial Ex. C08]

124. A statement that Newfield and Ute Energy "agreed" appeared in an earlier draft

of the May 20, 2011 letter, but was removed from the final version of the letter because Mr. Jaggers did not think that statement accurately summarized the situation. [Trial Ex. C08; Jaggers Testimony (Vol. I – 208:25-209:22)]

125. Mr. Jaggers testified that his letter was designed to pressure Newfield to offer Ute Energy a participation option for the Rocky Point assets acquired in the auction, even though Mr. Jaggers recognized that the Rocky Point AMI did not obligate Newfield to offer such an option. [Jaggers Testimony (Vol. I – 209:23-210:2, 211:19-23, 214:14-20)]

126. And Newfield promptly pointed out the inaccuracies in Mr. Jaggers' letter, responding that there were "lots of allegations in this letter that are not accurate." [Trial Ex. C09]

127. I therefore find that the May 20, 2011 letter is not direct evidence that Newfield and Ute Energy had an agreement that Ute Energy would not bid in the auction.

## IX. UTE ENERGY DECIDED INDEPENDENTLY NOT TO PARTICIPATE IN THE AUCTION FOR THE UINTA BASIN ASSETS

128. Contrary to Plaintiffs' assertion that Ute Energy's failure to submit a bid in the auction for the Uinta Basin Assets was the product of an illicit agreement, the evidence showed that Ute Energy made a unilateral decision that it would not participate in the auction or submit a bid for the Uinta Basin Assets outside the context of the auction.

129. Mr. Jaggers testified that, as the CEO of Ute Energy, he made a unilateral and independent decision that it was not in Ute Energy's economic interest to participate in the auction because he believed (mistakenly, as he later discovered) that Ute Energy would have the right to purchase a portion of the Uinta Basin Assets from Newfield under the Rocky Point AMI if Newfield was the successful bidder. [Jaggers Testimony (VolI – 138:11-13, 166:6-167:19, 168:15-169:6, 171:15-18, 224:25-225:1)]

130.     Ute Energy's decision not to participate in the auction and to allow Newfield, as the larger, better-capitalized AMI partner, to try to acquire the assets conforms to the decision-making one would expect from a party that believed it would have the opportunity to share assets  pursuant to the terms of an AMI.

131.     Expert witness, Professor Bruce Kramer, testified that it is the custom and practice in the  oil and gas industry for parties to an AMI not to bid against each other for assets covered by an  AMI because doing so would be economically irrational, something the United States Department  of Justice has recognized in its analysis of AMIs.  [Kramer Testimony (Vol. VII – 1358:2-  1360:21, 1361:2-19, 1376:14-1377:6, 1378:9-14); Jaggers Testimony (Vol. I – 188:2- 16);   Howard Testimony (Vol. II – 416:14-22, 417:1-3); Tresca Testimony (Vol. III – 618:17- 619:5)]

132.     Indeed, although the Harvest Entities and Branta Entities were parties to AMIs, neither could identify any circumstance in which they had bid against their AMI partners, and did not know of any situation in which parties to an AMI bid against each other for interests that fell within the area covered by the AMI.  [Tresca Testimony (Vol. III – 618:24-619:5); Edmiston Testimony (Vol. IV – 866:23-24, 867:10-868:4)]

133.     With his belief that Newfield would be required to share a portion of the Uinta Basin Assets with Ute Energy under the Rocky Point AMI if Newfield were successful in the auction, Mr. Jaggers' independent and unilateral decision that Ute Energy would not participate in the auction was consistent with the standard custom and practice in the industry and aligned with Ute Energy's economic self-interest.  [Kramer Testimony (Vol. VII – 1358:2-1360:21, 1361:2-19, 1376:14-1377:6, 1378:9-14); Jaggers Testimony (Vol. I – 166:6-11, 167:2-23, 188:2-16)]

134.     Plaintiffs' own expert, Dr. Schulman, confirmed that, if Ute Energy believed it would be able to share assets under an AMI, it is a reasonable economic inference that Ute Energy

would make no bid on the assets on its own, but, rather, would rely on the AMIs to provide Ute Energy's participation in the assets, particularly if Mr. Jaggers believed that the Rocky Point AMI applied, which he did. [Schulman Testimony (Vol. VI – 1157:10-18); Burtis Testimony (Vol. X – 1937:18-1938:2); Kramer Testimony (Vol. VII – 1376:14-25); Jaggers Testimony (Vol. I – 138:11-13, 171:15-18, 224:25-225: 2); Howard Testimony (Vol. II – 411:10-14)]

135.    The evidence further confirmed that Ute Energy to decide not to bid since it knew that it was barred from the auction process. [Jaggers Testimony (Vol. I – 196:25-197:3, 198:2-11, 198:17-25); Trial Exs. A44, 81, 93]

136.    Moreover, I find credible Mr. Jaggers' testimony that Ute Energy decided not to  bid based on its own financial situation and its expectation of what it would take to win the auction.

137.    First, the Bid Procedures expressly stated that bids were to be for the entirety of Plaintiffs' Uinta Basin Assets, rather than for a portion. [Trial Ex. B15 at B15_0004, 0008] Therefore, it would have been reasonable for Ute Energy to believe that it would have to bid on  the entirety of the Uinta Basin Assets in order to succeed at the auction.

138.    Mr. Jaggers expected the price of the Uinta Basin Assets to be around $300 million, but testified that under no circumstance could Ute Energy have bid on an asset with a value in that range, or even in the $200 million range. [Jaggers Testimony (Vol. I – 189:23-190:5, 226:14-23)]

139.    Mr. Jaggers testified that Ute Energy had the ability to raise no more than $100 million for all of the acquisitions that it was contemplating at the time. Thus, Ute Energy could not even have been certain that it could actually bid $100 million in the auction. Moreover, Ute Energy did not have such funds available when the bids were due, it did not know if the Ute Tribe  would be able or willing to contribute a sufficient matching amount to even total $100

million with Quantum's hypothetical contribution, and because the $100 million was the maximum amount Ute Energy had available for all acquisitions that Ute Energy was contemplating. [Trial Ex. B92; Jaggers Testimony (Vol. I – 133:22-25, 193:1-194:17, 194:22-196:3); Jaggers Testimony (Vol. XI – 2046:3-20); Trial Ex. B96 at B96_0002]

140. Based on its financial situation, Mr. Jaggers knew Ute Energy could not compete at the $300 million level and testified that, as a result, he made the business decision not to compete at all. [Jaggers Testimony (Vol. I – 166:6-15, 166:22-167:1, 188:20-189:10, 189:23-190:10, 192:16-193:3)]

141. Mr. Jaggers' testimony about the limitations on Ute Energy's financial capacity is not discredited by Plaintiffs' suggestion that its minority owner, Quantum, was sufficiently capitalized to finance the acquisition of the entirety of the Uinta Basin Assets.

142. Rather, I find that the fact that Quantum, the holder of a 49% interest in Ute Energy, may have had the resources to consummate an acquisition in excess of $100 million, was immaterial because the Ute Tribe, which owned 51% of Ute Energy, was unwilling to dilute its 51% majority interest and could not afford more than its 51% of $100 million. [Jaggers Testimony (Vol. I – 193:7-194:2, 226:14-23); Jaggers Testimony (Vol. XI – 2045:19-2047:3)]

143. Because of Mr. Jaggers' belief in the validity of the AMI in the Rocky Point EDA, along with Ute Energy's financial constraints, and its understanding that Plaintiffs intended to sell the Uinta Basin Assets altogether as a single package, Ute Energy gave no consideration to participating in the auction. [Jaggers Testimony (Vol. I – 201:7-21)]

144. There was also no evidence presented that Ute Energy would have attempted to purchase part of the Uinta Basin Assets outside of the auction.

145. Mr. Jaggers testified that he had no idea what Ute Energy would have done had it known it did not have rights under the Rocky Point AMI. It would be speculative. He did not

know what he would have offered or if he would have been successful. [Jaggers Testimony (Vol. I – 189:2-13, 201:15-21)] Regardless, Mr. Jaggers would not have considered making an offer even on a piece of the assets if Harvest had not let Ute Energy into the data room. [Jaggers Testimony (Vol. I – 199:1-11, 201:11-14)]

146.    Based on the evidence, I find that Ute Energy made the decision not to bid on the Uinta Basin Assets independently. As a result, I find that it is impossible to find with reasonable certainty that Ute Energy would have bid in the auction but for the alleged agreement.

## X.    UTE ENERGY'S PARTICIPATION IN THE AUCTION WOULD NOT HAVE CHANGED THE FINAL AUCTION PRICE

147.    Even if Ute Energy would have participated in the auction but for the January 13, 2011 telephone call between Mr. Jaggers and Mr. Howard, Plaintiffs failed to present convincing evidence that Ute Energy's participation would have impacted the outcome of the auction in any fashion, let alone resulted in a greater price to Plaintiffs.

### a.    Newfield Bid Its Maximum Amount At The Auction And Would Have Bid No More

148.    Plaintiffs argued that Newfield could have and would have paid more for the Uinta Basin Assets. The evidence, however, demonstrated that Newfield was constrained in what it was willing to pay for the Uinta Basin Assets, with $300 million being the approximate maximum outlay it would make.

149.    As announced in a publicly-filed Form 8-K, in 2010, Newfield had agreed to pay $405 million for assets in another transaction referred to as the EOG transaction. The EOG transaction fell through in December of 2010. The $405 million approved by the board for the EOG transaction was the maximum amount Newfield's CEO, Lee Boothby, was willing to ask the Newfield board to approve for acquisitions in 2011. Newfield then decided to invest approximately $100 million of that amount in the Anadarko Basin, leaving approximately $300

million for the potential purchase of the Uinta Basin Assets in March of 2011.  [Boothby Testimony (Vol. VIII –1687:3-25, 1714:21-1723:22); Trial Ex. 177 at 177-002]

150.    Mr. Boothby initially capped Newfield's bid at $300 million.  [Boothby Testimony  (Vol. VIII – 1685:16-25, 1686:14-1687:25)]  Newfield's first offer of approximately $287.5  million was made so that Newfield would have room to "sharpen its pencil" in an anticipated  second round of bidding and still be within Newfield's $300 million limit.  [Boothby Testimony  (Vol. VIII – 1686:1-13); Massaro Testimony (Vol. VIII – 1593:20-1596:12)]

151.    After Newfield was told that there were other bids for the whole asset package, and  BAML/Harvest asked Newfield to increase its bid "a little," the parties agreed to a price of $295  million.  [Boothby Testimony (Vol. VIII – 1690:6-17); Massaro Testimony (Vol. VIII – 1598:7-21, 1600:19-1601:2, 1603:1-19)]  However, Newfield was not prepared to go above $300 million,  and agreed to pay $310 million only because it gave Newfield an additional right to negotiate  exclusively to the final purchase and sale agreements on the presumption that there were other  competitively-priced conforming bids.  [Boothby Testimony (Vol. VIII – 1690:18-1691:13,  1691:19-1692:17, 1692:18-21); Massaro Testimony (Vol. VIII – 1600:8-1602:17, 1604:7-9, 1604:15-1605:5); Trial Ex. B41]

152.    Newfield purchased exclusivity because of the expectation of competition.  Not only had it had been told there were competing bids (*i.e.*, that there was competition), but Newfield also wanted to avoid Plaintiffs shopping the Newfield bid before a binding agreement  could be negotiated.  [Trial Ex. B47; Massaro Testimony (Vol. VIII – 1661:10-17)]  In the end,  Branta did in fact shop Newfield's bid to Morgan Stanley, though Morgan Stanley declined to  compete because the assets were now "too pricey."  [Trial Ex. B44]

153.    The evidence at trial was unequivocal that Newfield was not willing to increase its bid beyond the $310 million it eventually bid.  [Boothby Testimony (Vol. VIII –1687:12-18,

1688:1-4, 1693:4-11)]

154.    Not only was the acquisition budget constrained, as detailed above, but also Newfield had to ensure a corporate rate of return of approximately 20%, and so could not increase its bid beyond the point where it could obtain such a return.  [Trial Ex. B26; Boothby Testimony (Vol. VIII – 1676:17-20, 1686:14-1687:2); Massaro Testimony (Vol. VIII – 1568:19-21, 1569:7-15)]

155.    The evidence showed not only that Newfield bid its maximum amount with the $295 million plus $15 million for exclusivity, but also showed that Plaintiffs knew that Newfield was unwilling to go any higher.  Harvest's CEO, Mr. Edmiston, asked Newfield's COO, Mr. Packer,  to pay an additional $5 million, but Mr. Packer responded that Newfield was unable to obtain  authority to pay additional amounts.  [Edmiston Testimony (Vol. IV – 881:9-882:16)] This  testimony from Mr. Edmiston confirms Newfield's testimony that Newfield was unwilling to pay  any more than $295 million for the Uinta Basin Assets, which became $310 million when exclusivity was added.

156.    Because Newfield paid its absolute maximum for the Uinta Basin Assets, the presence of Ute Energy in the auction would not have impacted the amount Newfield offered for these assets.  This is reflected by the fact that Newfield did not adjust the amount of its bid in response to notice of a partial bid, but rather based on the belief that there were other competing bids for the entirety of the Uinta Basin Assets.  [Boothby Testimony (Vol. VIII – 1686:14-1687:18, 1688:5-1690:17); Massaro Testimony (Vol. VIII – 1598:9-1599:7, 1604:1-6, 1636:2-25, 1661:23-1662:2)]  Moreover, a bid for $100 million from Ute Energy (its absolute maximum capability) would have been far inferior to the $180 million partial bid submitted by BBC, and thus would have been expected to have no impact on Newfield's maximum bid amount.  [Burtis Testimony (Vol. X – 1988:21-1990:2)]

### b. **<u>Ute Energy's Participation Would Not Have Changed Newfield's Bidding In The Auction</u>**

157.    Newfield's undisputed willingness to spend no more aside, Plaintiffs argue that Newfield would have bid and paid more for the Uinta Basin Assets had Ute Energy participated in the auction, because the addition of a single competitor in the process would necessarily have led to a higher price for the assets.

#### i.    <u>Newfield Already Considered Ute Energy In Formulating Its Bids</u>

158.    Preliminarily, the evidence showed that Newfield already considered the possibility that Ute Energy would be a competitor in formulating its bids.  Newfield did not know whether Ute Energy would bid in the auction, however, because of Ute Energy's small size and its majority ownership by the Ute Indian Tribe, Newfield did not believe that Ute Energy would be a meaningful competitor in the auction and did not formulate its bid based on whether Ute Energy would participate.  [FF # 54]  Nonetheless, Newfield included Ute Energy in its analysis of potential competitors when formulating its bid.  [Trial Ex. 9 at 9_065]

#### ii.    <u>The Participation In The Auction Of A Single Additional Competitor Would Not Have Impacted Newfield's Bidding</u>

159.    I turn now to the parties' competing theories of the impact of a single additional competitor like Ute Energy on the outcome of the auction.

160.    Plaintiffs' expert, Dr. Schulman, testified that the number of bidders participating in an auction is decisive with respect to how competitive the bidding will be and how high the price received.  Dr. Schulman opined that, had a single additional bidder (Ute Energy) participated in the auction process, the mere presence of that additional bidder would have caused  Newfield to pay a higher price for the Uinta Basin Assets.  [Schulman Testimony (Vol. VI –  1124:14-16)] Indeed, Dr. Schulman opined that a bidder like Newfield would have been focused  only on how many competitors were participating in the auction.  [Schulman Testimony (Vol. VI– 1145:12-

22)]

161.     In support of his theoretical approach, Dr. Schulman relied upon a single article that he claimed demonstrated that economic theory supports the conclusion that the addition of a single bidder would have an impact in a sealed bid auction of the sort used by Plaintiffs here. [Schulman Testimony (Vol. VI – 1144:25-1145:11); Burtis Testimony (Vol. X – 1926:9-1933:8)]

162.     By contrast, Newfield's expert, Dr. Burtis, testified that economic theory shows that a company participating in an auction will focus on who it believes the second highest bidder would be.  [Burtis Testimony (Vol. X – 1922:6-1925:7)]  She highlighted that the article relied upon by Dr. Schulman does not conclude that the presence of a single additional bidder in an auction necessarily results in a higher price achieved in the auction.  [Burtis Testimony (Vol. X – 1929:13-1930:10)]

163.     I find Dr. Burtis' explanation of the economic theory relevant to bid determination in a sealed-bid auction more persuasive in this case; but, in any event, for Dr. Schulman's thesis to have merit,   the bidding party would have to know how many other bidders there were, the underlying assets would have to be valued subjectively, or the other bidders would not have considered profit maximization.

164.     It is undisputed, however, that in a sealed bid auction, a participant like Newfield does not know how many other participants or bidders there are.  [Schulman Testimony (Vol. VI–1143:9-12)]  Thus, there is no reason to believe that Newfield would have known had Ute Energy submitted a bid or that its submission would have impacted Newfield's bid.

165.     Under Dr. Burtis' theory – that a rational economic actor would consider only the second highest bidder in formulating its bid –Ute Energy's submission of a bid likewise would have had no impact on Newfield's bid amount because Ute Energy was not expected to be the

second highest bidder, El Paso was.

166.     And, consistent with Dr. Burtis' testimony regarding the applicable economic theory, Newfield based its bid on El Paso in evaluating its competition, and analyzed in detail the amount it expected El Paso, as the second highest bidder and strongest competitor, to bid. Newfield's analysis and decision review documents show it was concerned with the potential bid to come from El Paso.  [Trial Ex. 9 and 9-065; Trial Ex. B25; Trial Ex. 125]

167.     Newfield's analyses of competitor valuations focused on a company positioned like El Paso, making decisions about development that Newfield expected El Paso to make. [Trial Exs. B25, 125]  There is no evidence that Newfield's bid analysis included any consideration of the number of potential bidders.  Its analysis was focused on who it expected to submit competitive bids and at what price levels, just as Dr. Burtis testified a bidder in Newfield's  position is expected to do under the economic theory of auctions.

168.     The evidence demonstrated that Newfield did not believe its internal valuation of $220 million would be sufficient to overcome a bid from El Paso, thus leading Newfield to raise  its initial bid to approximately $287 million in the hopes of being competitive with El Paso in the  first stage of the auction.  [Howard Testimony (Vol. II – 370:19-25)]

169.     And Newfield increased its bids when informed that there were "other bidders" in the auction.  [Massaro Testimony (Vol. VIII – 1598:7-1599:7, 1636:12-25, 1639:25-1640:4)]  It was not informed of how many other bidders there were, so the number of bidders was irrelevant  to determining whether to raise Newfield's bids.  [Massaro Testimony (Vol. VIII – 1598:7-  1599:7, 1636:12-25, 1639:25-1640:4); Howard Testimony (Vol. II – 328:3-329:4); Nesselrode   Testimony (Vol. IV – 786:12-17)]

170.     There is no evidence that the participation of an additional bidder – undisclosed to Newfield, and which was not expected to be the second-highest bidder – would have impacted

Newfield's decision-making or caused it to raise its bid further.  [Burtis Testimony (Vol. X – 1961:10-1962:13)]

171.     Based on the evidence at trial, I find that Ute Energy's participation in the auction would not have  caused Newfield to submit a bid in excess of the $310 million winning bid.  Plaintiffs' claim to  the contrary is based on speculation and contradicted by the evidence.

>    **c.   There Is No Evidence That Ute Energy Would Have Submitted A Bid That Would Have Impacted The Final Auction Price**

172.     Even presuming Newfield could or would have bid more had there been additional  competition, there is no credible evidence from which to conclude that Ute Energy would have submitted   a bid that would have impacted the final price received by Plaintiffs for the Uinta Basin Assets,   whether in the auction or outside.

173.     Plaintiffs' expert, Dr. Schulman assumed that absent the alleged agreement with Newfield, Ute Energy would have bid on the Uinta Basin Assets, and, based on those assumptions, testified that such participation would have caused the price received to increase. Dr. Schulman acknowledged that if there was no such agreement, then his opinion is rendered moot.  [Schulman Testimony (Vol. VI – 1137:21-1138:2)]  He did not perform any of the kinds of economic analysis typically performed by economists to  quantify the amount of that increase, but relied on the analysis prepared by Plaintiffs' other  expert, Mr. McBeath (discussed below) to establish the range of values and damages.  [Schulman  Testimony (Vol. VI – 1126:21-1127:10, 1137:18-20)]

174.     Dr. Schulman's assumption that Ute Energy would have bid on at least part of the  assets ignores the weight of the evidence to the contrary, namely, that Ute Energy decided independently not to participate based on its own financial limitations, its knowledge that it was barred from the auction, and its belief that the AMIs with Newfield would have provided it the

ability to participate if Newfield won the assets.  [FF# 128-143]

175.    Moreover, as Newfield's expert, Quentin Mimms, testified, it is improper to assume that Ute Energy would have bid (and thus could have impacted the outcome) without even addressing the record evidence that negates the validity of the assumption.  [Mimms Testimony (Vol. X – 1983:9-1984:8)]  Indeed, in the face of contrary evidence, it was not reasonably certain that Ute Energy would have participated in the auction but for the alleged agreement.  [Mimms Testimony (Vol. X – 1984:10-22)]

176.    Even if it were reasonable to assume that Ute Energy would have attempted in some manner to acquire the Uinta Basin Assets, the evidence contradicts any argument that Ute Energy could have submitted a competitive bid in the auction.  As a result, Plaintiffs presented argument to the effect that Ute Energy would have attempted to submit a partial bid outside the auction process, and that such a bid would have led to a greater price for the entirety of the assets.

177.    In support of this argument, Dr. Schulman hypothesized that it was possible Ute  Energy and other companies could have bid, and the various pieces of the Uinta Basin Assets  could have been sold piecemeal for more than was received when sold together.  [Schulman  Testimony (Vol. VI – 1139:15-19)]

178.    Mr. Mimms highlighted that Dr. Schulman's suggested "but for" scenario ignores  the evidence that Plaintiffs strove to sell the assets altogether and rejected expressions of interest  in partial bidding.  [Mimms Testimony (Vol. X – 1984:23-1985:14)]  Again, the failure to  consider this evidence rendered Dr. Schulman's testimony unreliable and insufficient to satisfy  the standard of reasonable certainty.  [Mimms Testimony (Vol. X – 1986:11-19)]

179.    The Branta Entities and Harvest Entities were not interested in selling only a portion of the Uinta Basin Assets in the auction, and therefore issued bid instructions requiring

that all bids be for 100% of each Plaintiff's portion of the assets. [Trial Ex. B15 at B15_0004, 0008; Nesselrode Testimony (Vol. IV – 727:2-7, 731:10-15, 733:3-7, 735:9-16, 739:16-740:1, 740:9-20, 742:15-24); Sooby Testimony (Video Depo. – 47:19-48:1); Tresca Testimony (Vol. III–644:4-20)] There is no reason to suspect that Plaintiffs would have accepted a $100 million bid over the Newfield or BBC bids, or that a partial bid outside the auction process or within would have changed Plaintiffs' decision to accept the Newfield offer for the whole.

180. Furthermore, even if there were evidence from which I could find it reasonable to extrapolate that Plaintiffs might have been willing and able to sell the Uinta Basin Assets piecemeal, there is no evidence from which I can determine what the outcome of such a piecemeal process would have been.

181. Plaintiffs presented no evidence of what Ute Energy could have or would have bid had it decided to make an offer for part of the Uinta Basin Assets or what part of their assets Ute Energy would have bid for had it submitted a partial bid, and have not shown that Newfield's bid would have been on the remainder, or even if Newfield would have been willing to accept only a portion of the assets being offered. There was no evidence presented as to how the various bidders – Newfield, BBC, and, hypothetically, Ute Energy – might have bid on different pieces of the assets and how the entirety of the assets could have been sold through the auction process or outside it through a negotiated division of the assets amongst the three entities. I therefore find that it would be entirely speculative to find that Plaintiffs would have received more for the Uinta Basin Assets had Ute Energy submitted a partial bid. This is particularly true since there is no evidence or reason to believe that Newfield would have known if Ute Energy had submitted a bid or anything about the details of such a bid.

## XI. PLAINTIFFS DID NOT PROVE ANY NON-SPECULATIVE DAMAGES FROM UTE ENERGY'S ABSENCE FROM THE AUCTION WITH REASONABLE ECONOMIC CERTAINTY

182.     Plaintiffs claim that they were damaged in an amount equal to the difference between the price they received from Newfield and the price Newfield would have paid had Ute Energy participated.

183.     In support of this claim, Plaintiffs presented the analysis of its expert, Mr. McBeath, who purported to calculate a range of values that a company with the information Newfield possessed would have placed on the Uinta Basin Assets.  But Newfield is the only company possessing that information so, in effect, Mr. McBeath was purporting to impute to Newfield a value for the Uinta Basin Assets.

184.     Mr. McBeath admits that he did not perform or even attempt to perform a market value analysis of the Uinta Basin Assets.  [McBeath Testimony (Vol. VI – 1254:9-1255:8)]

185.     Mr. McBeath also did not perform an independent evaluation of the range of values of the Uinta Basin Assets because he did not perform a rigorous engineering evaluation of the production decline profiles, nor did he independently evaluate the producing formations that are included in his discounted cash flow.  [Gonzenbach Testimony (Vol. IX – 1787:23-1789:3)]

186.     Instead, Mr. McBeath utilized the data on which he believed Newfield relied – with some modifications – to determine a range of value for the Uinta Basin Assets.  [McBeath Testimony (Vol. VI – 1205:7-18, 1205:24-1206:8); Gonzenbach Testimony (Vol. IX – 1789:4-12)]

187.     Mr. McBeath's analysis was unreliable and cannot be utilized to prove damages with reasonable certainty, even assuming, as he did, both an illegal bid-rigging agreement and causation.

188.     Most importantly, Mr. McBeath presumed in his analysis that the basal

carbonate  formation was a "probable reserve."  [McBeath Testimony (Vol. VI – 1220:21-25)]

189.    To be probable reserves, an oil or gas play must be "commercial."  [McBeath Testimony (Vol. VI – 1286:17-1287:4); Gonzenbach Testimony (Vol. IX – 1808:13-1809:10)] The Petroleum Reserve Management System ("PRMS"), which is regularly used in the industry to classify reserves (now, even if it was not in 2011, as Mr. McBeath testified), requires actual production or formation tests to prove commerciality.  [McBeath Testimony (Vol. VI – 1286:17-  22)]  A well must have been drilled and competed in the horizon and been commercially  produced in order to demonstrate commerciality.  [Tresca Testimony (Vol. III – 638:5-10)]

190.    The basal carbonate in the Uinta Basin was "virtually untested," and had not yet been proven to be commercial, at the time of the auction.  [Howard Testimony (Vol. II – 380:2-21, 381:6-17); Nesselrode Testimony (Vol. IV – 766:17-20); Head Testimony (Vol. VIII – 1730:9-12); Jergensen Testimony (Vol. V – 1040:24-1041:1); Kerchner Testimony (Vol. V – 951:21-952:4); Packer Testimony (Vol. VII – 1415:10-23); Gonzenbach Testimony (Vol. IX – 1797:17-1798:11)]

191.    No horizontal wells had yet been drilled into the basal carbonate and the only horizontal wells drilled in the Greater Monument Butte Unit below the central part of the basin had been viewed as uneconomic.  [Kerchner Testimony (Vol. V – 951:21-952:4); Howard Testimony (Vol. II – 380:2-21, 381:6-17); Tresca Testimony (Vol. III – 637:10-14, 642:19-23, 643:12-15)]

192.    Mr. McBeath's analysis was predicated on the expectation that the basal carbonate  would be developed through horizontal drilling.  As such, Mr. McBeath should not have  categorized the basal carbonate as probable reserves.  He claims to have done so, however, based  on his belief that Newfield categorized the basal carbonate as probable reserves and

because he believed it was not a huge leap to say economic vertical production would lead to economic horizontal production. [McBeath Testimony (Vol. VI – 1234:23-1235:5)]

193. As an independent evaluator of the value of these assets, Mr. McBeath should have categorized the basal carbonate as a "contingent resource" [McBeath Testimony (Vol. VI – 1289:18-22); Gonzenbach testimony (Vol. IX – 1795:20-25)], based on the undisputed fact that the commerciality of the basal carbonate had not yet been proved.

194. By treating the basal carbonate as probable reserves instead of as a contingent resource, Mr. McBeath placed significant and excessive value on the basal carbonate. [Gonzenbach Testimony (Vol. IX – 1801:16-1802:11, 1804:17-1805:14, 1806:17-1807:4)] Mr. McBeath agreed that he would not usually assign any value to contingent resources when evaluating a play because of the risk factors that are associated with modeling the value of such resources. [McBeath Testimony (Vol. VI – 1289:11-17)] Moreover, he agreed that if the basal carbonate had not yet been proved to be commercial, he should have assigned no value to it. [McBeath Testimony (Vol. VI – 1289:18-22)] Newfield's expert, Mr. Gonzenbach, confirmed that contingent resources are so risky that one would not typically assign any value to them. [Gonzenbach Testimony (Vol. IX – 1809:23-1810:15, 1812:12-16)]

195. The evidence is undisputed that the basal carbonate had not yet been proved commercial at the time of the auction. Mr. McBeath therefore should have given no value to the basal carbonate in his analysis; instead, he valued the basal carbonate at $96 million to $326 million. [McBeath Testimony (Vol. VI – 1282:18-1283:16)]

196. By contrast, Newfield in fact placed a $50 million value on the basal carbonate. [Kerchner Testimony (Vol. V – 936:9-23)] This reflected the speculative nature of the basal carbonate portion of the assets. [Kerchner Testimony (Vol. V – 936:5-23); Jergensen Testimony (Vol. V – 1032:5-20)] Mr. McBeath's analysis of what value he thinks Newfield

48

(the only party possessing the information Mr. McBeath considered) might have placed on the assets is far less reliable than the value Newfield <u>actually</u> placed on the assets.

197. Mr. McBeath also failed to consider the costs associated with failed wells. Instead, he accounted only for the costs of successful wells, even though it is improper to presume that all wells drilled within a resource play will be successfully drilled and produced. [Kerchner Testimony (Vol. V – 954:2-14); McBeath Testimony (Vol. VI – 1272:24-1273:7)]

198. The Uinta Basin Assets were considered, by all parties, including Plaintiffs, a "resource play." [Trial Ex. 5 at 005-003; Trial Ex. 7 at 007-001; Trial Ex. 8 at 008-001]

199. Even though it is improper to assume that all wells drilled within a resource play will be successfully drilled and produced [Kerchner Testimony (Vol. V – 954:2-14); McBeath Testimony (Vol. VI – 1272:24-1273:7); Gonzenbach Testimony (Vol. IX – 1817:17-1818:7, 1870:14-1871:1)], Mr. McBeath accounted only for the costs of successful wells, ignoring the costs for wells that are expected to be unsuccessful.

200. Expert testimony established that when evaluating a resource play (irrespective of whether the particular formations are characterized as a contingent resource or as a reserve), one has to account for the costs of all the wells expected to be drilled, not just the successful ones, because one has to bear the cost of the unsuccessful drilling efforts as well. [Kerchner Testimony (Vol. V – 954:2-14); Gonzenbach Testimony (Vol. IX –1808:2-3, 1817:14-1818:7)]

201. The costs associated with the unsuccessful wells that Mr. McBeath did not consider were over $700 million. [McBeath Testimony (Vol. VI – 1276:14-1277:24); Gonzenbach Testimony (Vol. IX – 1813:17-1814:3, 1817:8-16, 1820:8-1821:5, 1822:1-11)]

202. By failing to account for these significant costs, Mr. McBeath vastly overstated the value of the Uinta Basin Assets. [Gonzenbach Testimony (Vol. IX – 1872:19-21, 1874:5-16); Trial Ex. C50 at C50_0036)]

203.     Mr. McBeath's use of a risk adjustment factor did not negate the need to account for the costs of the failed wells.  [Gonzenbach Testimony (Vol. IX – 1822:13-1823:2)]

204.     Mr. McBeath also purported to rely on what he called "valuations" from Newfield's internal records to show that Newfield valued the Uinta Basin Assets higher than its  bids.  [McBeath Testimony (Vol. VI – 1210:13-24, 1220:21-25, 1295:20-1296:7)]

205.     The "internal valuations" to which Mr. McBeath pointed (in particular, Trial Exhibit 118), however, were merely economic runs testing the impact of numerous variables and assumptions, not valuations, and should not have been viewed as valuations by Mr. McBeath, and were merely some of the runs performed by Ms. Kerchner, not all.  [Kerchner Testimony (Vol. V– 926:7-17, 946:9-947:11, 946:20-25, 948:15-949:6); Howard Testimony (Vol. II – 373:12-17)] Ms. Kerchner testified unequivocally that it would be a "distortion of the work" she and her team were doing to take any of the individual runs reflected in the documents highlighted at trial by Plaintiffs and "say that's what Newfield's view of the value of these assets was."  [Kerchner Testimony (Vol. V – 948:24-949:6)]

206.     Furthermore, the "playing fields" to which Plaintiffs gave much weight did not evidence a higher internal valuation from Newfield than the bids actually made.  Rather, they focused on what valuations would look like under assumptions determined to be unrealistic, and on how Newfield believed its primary competitor (El Paso) would value the assets.  [Howard Testimony (Vol. II – 368:11-15, 369:2-370:10)]  Plaintiffs assume this was a bid range for Newfield, but Newfield's witnesses confirmed that it was in fact an estimate of the expected competitor valuation.  [Jergensen Testimony (Vol. V – 1005:11-24, 1027:2-11, 1028:16-24, 1029:24-1030:10); Kerchner Testimony (Vol. V – 956:18-957:15)]

207.     And the portfolio analysis that Plaintiffs claim shows Newfield valued the Uinta Basin Assets higher than their bids also were not bid recommendations or valuations, but just an

unbiased look at how the company should choose investment opportunities from amongst many options.  [Packer Testimony (Vol. VII – 1463:13-15); Howard Testimony (Vol. II – 346:15-25, 359:24-360:2, 361:4-10)]

208.    Rather, the uncontested evidence is that Newfield's Rocky Mountain Business Unit valued the Uinta Basin Assets at $220 million and recommended a bid at that level. [Howard Testimony (Vol. II – 374:4-13); Kerchner Testimony (Vol. V – 985:13-17)]

209.    Based on the expectation of robust competition and reflecting its desire to win in the auction, Newfield ultimately bid approximately $310 million—$90 million above its internal valuation.  [FF# 51-56, 151-152, 156]  Newfield's personnel believed the $310 million bid was very aggressive.  [Kerchner Testimony (Vol. V – 961:12-15)]

## XII.    THE HARVEST ENTITIES AND BRANTA ENTITIES COULD HAVE REJECTED NEWFIELD'S BID BUT CHOSE NOT TO DO SO, AND THE FINAL  AUCTION PRICE WAS WELL ABOVE THE MINIMUM EXPECTED PRICE AND WAY ABOVE PRIOR VALUATIONS OF THE UINTA BASIN ASSETS

210.    Whatever complaints Plaintiffs may have now about the $308 million they received from Newfield for the Uinta Basin Assets, Plaintiffs received a price that appears to have been the result of a competitive process and which was within the range expected by Plaintiffs, and which Plaintiffs agreed at the time was a great result for their companies.

211.    As stated in Plaintiffs' bid procedures, the Harvest Entities and Branta Entities reserved the right not to sell the Uinta Basin Assets to any bidder.  [Trial Ex. B15 at B15_0005, 0009]  Thus, either the Harvest Entities or the Branta Entities could have decided not to sell their interests had they thought they could get more for the Uinta Basin Assets than what Newfield had bid, whether from Newfield, some other party, or some combination of parties.  [Tresca Testimony (Vol. III – 576:19-21, 678:13-20); Nesselrode Testimony (Vol. IV – 737:17-19, 790:12-15); Edmiston Testimony (Vol. IV – 825:24-827:10)]

212.     Newfield's bid was within the range that the Branta Entities and Harvest Entities expected to receive, and well above the minimum that was expected.  Prior to the auction, Mr. Edmiston told Mr. Tresca that he expected the Uinta Basin Assets would sell for between $200 to $400 million and Mr. Tresca wrote in an email that the floor was $200 million.  [Trial Ex. A43 at A43_0003; Trial Ex. A49 at A49_0002; Tresca Testimony (Vol. III – 658:19-659:12, 659:18-660:8)]

213.     Newfield's bid for the Branta E&P assets was also significantly higher than the amounts offered to Branta E&P when it was exploring the sale of its assets in 2010.  In 2010, BBC offered Branta E&P $12.7 million for its share of the Uinta Basin Assets.  [Tresca Testimony (Vol. III – 607:5-15, 608:3-7)]

214.     In addition, on July 1, 2010, Branta E&P sold a 10% interest in the Uinta Basin Assets to Harvest (US) for $20 million (which would equate to a value of approximately $200 million for 100% of the Uinta Basin Assets, of which approximately $60 million would be attributed to Branta E&P's remaining 30% share).  [Trial Ex. A14; Edmiston Testimony (Vol. IV– 808:25-810:18); Tresca Testimony (Vol. III – 563:25-564:8, 566:10-17, 567:8-13)]

215.     On September 29, 2010, Newfield offered to purchase Branta E&P's share of the Uinta Basin Assets for $77 million (which would impute a value of $210 million to the entirety of  Plaintiffs' interest in the Uinta Basin Assets).  [Trial Ex. 47]

216.     No bid, other than those from Newfield and BBC, was received in the auction for all of the Uinta Basin Assets, despite the fact that BAML contacted 47 companies in its calling program.  [Trial Ex. 18]

217.     BAML, Plaintiffs' investment bank, was not surprised that Newfield was the only bidder for the entire package of Uinta Basin Assets offered by Plaintiffs, nor did BAML consider Newfield's bid too low.  [Sooby Testimony (Video Depo. – 105:21-106:15)]

218. Mr. Edmiston, in an email to his employees, described the sale to Newfield as "an outstanding transaction for the company." [Trial Ex. B76]

219. Mr. Edmiston also wrote an email to Mr. Packer stating that: "It's not often that an asset transaction is recognized as a clear win-win for both parties. In this case, I think the market response speaks for itself in that regard." [Edmiston Testimony (Vol. IV – 887:2-12); Trial Ex. B79]

220. Harvest expressed its satisfaction with the result by awarding Mr. Edmiston and Mr. Nesselrode significant cash bonuses, $200,000 to Mr. Edmiston and $100,000 to Mr. Nesselrode. [Head Testimony (Vol. VIII – 1733:20-1734:5)]

## XIII. NEWFIELD DID NOT BREACH THE CONFIDENTIALITY AGREEMENTS

221. In addition to its claim that Newfield entered into a bid-rigging agreement with Ute Energy, Plaintiffs claim that Newfield breached the Branta CA and the Harvest CA through communications it had with Ute Energy.

222. Branta does not claim any breach by Newfield of the Branta CA based on the disclosure of proprietary or confidential information. [Tresca Testimony (Vol. III – 621:13-17)]

223. Instead, Branta claims that Newfield breached the Branta CA by virtue of its communications with Ute Energy regarding the auction, which Branta argues breached the CA's non-circumvention provision. [Tresca Testimony (Vol. III – 560:12-21, 563:6-16, 621:18-22, 685:3-6)] Branta argues that it had a prospective business relationship with Ute Energy, thus triggering the non-circumvention provision.

224. The Branta CA's non-circumvention provision, however, was never intended to bar a party from talking to its own partners. [Trial Ex. 27 at 027-002 ¶ 4] Even Branta admits that Newfield was not barred from talking to its own partners in the ordinary course of business. [Tresca Testimony (Vol. III – 590:13-19, 624:23-626:3)] And Mr. Howard testified that

Newfield would never have expected the non-circumvention provision to "basically shut down any business communications that [Newfield] would have had prior to this agreement," as Branta suggests the Branta CA required. [Howard Testimony (Vol. II – 396:4-20)]

225. Moreover, Ute Energy did not have an existing or prospective business relationship with either of the Branta Entities between January 7, 2011 and the close of the transaction on May 17, 2011. Ute Energy was barred by Mr. Edmiston from participating in the auction process by no later than January 7, 2011, and that bar was reiterated to Mr. Nesselrode after Mr. Nesselrode spoke with Mr. Jaggers on January 13, 2011. [FF # 33-34, 38] Ute Energy had no further contact with the Harvest Entities, the Branta Entities, or BAML after the January 2011 calls between Mr. Jaggers and Mr. Nesselrode. [FF # 47] Moreover, the Branta Entities were precluded from communicating the Ute Energy under the Branta CA based on Newfield's preexisting business relationship with Ute Energy. [FF # 4-5, 12-14, 21-24]

226. Branta's sole basis for claiming that it had a prospective business relationship with Ute Energy at any relevant time is that Branta hoped Ute Energy would bid, be the high bidder, and then buy all of the assets. [Tresca Testimony (Vol. III – 680:13-17)]

227. The evidence shows that Newfield was mindful of its obligations under the Branta CA, with senior executives directing their teams to "make sure we take care to honor the CA" and to "make sure all the I's are dotted and T's are crossed." [Trial Exs. 56, 59]

228. None of the documents highlighted at trial evidenced Newfield providing any confidential information or information regarding the status of the auction to Ute Energy between the time Newfield gained access to the auction by executing the Harvest CA on February 17, 2011 and the transaction's closing on May 17, 2011. [Trial Exs. 95, 106, 115, 130, 132, 153, 159-161, 164]

229.	And both Mr. Howard and Mr. Jaggers confirmed that no confidential information or information regarding the status of the auction was disclosed by Newfield to Ute Energy. [Howard Testimony (Vol. II – 450:16-451:22, 456:5-457:8, 464:12-470:8, 470:22-471:4); Jaggers Testimony (Vol. I – 215:2-217:14, 218:15-23)]

230.	Plaintiffs presented no evidence that Newfield initiated contact with Ute Energy concerning the auction at any time between when Newfield gained access to the process (*i.e.*, the date Newfield executed the Harvest CA) and the transaction's closing on May 17, 2011.  [Jaggers Testimony (Vol. I – 215:2-14); Howard Testimony (Vol. II – 470:1-8, 470:22-471:1)]

231.	Moreover, there was no evidence that Newfield disclosed to Ute Energy any confidential, non-public information regarding the transaction or Plaintiffs' assets between the time Newfield gained access to the auction and the transaction's closing.  [Howard Testimony (Vol. II – 450:16-451:22, 456:5-457:8, 464:12-470:8, 470:22-471:4); Jaggers Testimony (Vol. I – 215:2-217:14, 217:18-218:4, 218:15-23); Jaggers Testimony (Vol. II – 254:11-13); Trial Ex. 95, 106, 115, 130, 132, 153, 159, 160, 161, 164]

232.	Plaintiffs pointed to a slide prepared by Ute Energy and supposedly approved by Newfield in late March 2011 after Harvest had made its public disclosure of the sale as evidence that Newfield disclosed information.  The slide itself, however, makes clear the source of its information was Harvest's public disclosures.  [Trial Ex. 153 at 153-002; Trial Ex. 154; Howard Testimony (Vol. II – 443:17-444:8)]  But no new parties could have entered the process after the date on which Plaintiffs agreed to negotiate exclusively with Newfield, March 11, 2011. [Edmiston Testimony (Vol. IV – 895:16-896:2)]  Regardless, the question of how to share an asset under an existing AMI should the asset be acquired is not divulging information learned in the data room or from Harvest or Branta, nor is it divulging the status of the transaction.  It is simply a discussion regarding the existing business relationship between the parties.

## CONCLUSIONS OF LAW

Based on the foregoing factual findings, the Court hereby enters the following conclusions of law and judgment in favor of Newfield and against Plaintiffs on each of the claims for relief:

## I. NO BREACH OF THE CONFIDENTIALITY AGREEMENTS

1. Both the Branta CA and the Harvest CA are governed by Texas law. [Trial Ex. 27 at 027-004; Trial Ex. 32 at 032-005; Trial Ex. 98]

2. The four elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from the breach. *Velvet Snout, LLC v. Sharp*, 441 S.W. 3d 448, 451 (Tex. App. 2014). Plaintiffs bear the burden of proving a breach by a preponderance of the evidence. *Castillo v. Case Farms of Ohio, Inc.*, 96 F. Supp. 2d 578, 642 (W.D. Tex. 1999).

3. "[W]hen one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform." *X Techs., Inc. v. Marvin Test Sys., Inc.*, 719 F.3d 406, 413 (5th Cir. 2013) (quoting *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994)).

4. Reciprocal promises are presumed to be mutually dependent and the breach by one party excuses the performance of the other. *DEW, Inc. v. Depco Forms, Inc.*, 827 S.W.2d 379, 382 (Tex. App. 1992) (collecting cases).

### a. The Branta CA

5. Branta does not allege that Newfield breached the Branta CA by virtue of disclosure of confidential or proprietary information. [FF# 222] Branta's claim relates exclusively to an alleged breach of paragraph 4 of the Branta CA – the Non-

Circumvention provision.  [FF # 223]

6.      The Non-Circumvention provision in the Branta CA barred either party to the agreement from having contact with "any of the other party's or its subsidiary's of affiliate's lenders, equity owners, co-working interest owners, joint exploration and development partners or other persons having existing or prospective business relations with the other party or its subsidiaries."  [Joint Facts # 24]

7.      This language is, unequivocally, mutual, and precluded Plaintiffs from having unapproved contact with Newfield's "affiliate's lenders, equity owners, co-working interest owners, joint exploration and development partners or other persons having existing or prospective business relations with the other party or its subsidiaries."  [FF #21; Joint Facts # 24]

8.      Ute Energy was Newfield's co-working interest owner and joint exploration and development partner.  [FF # 4-5, 12-14]

9.      Because Ute Energy was Newfield's co-working interest owner, the Branta Entities were precluded from having affirmative contact with Ute Energy without the prior written consent of Newfield.  [FF # 22-24]

10.     The Branta Entities, through their various representatives, contacted Ute Energy to market the Branta Entities' assets on September 30, 2010, and met with Ute Energy on October 4, 2010 to explore opportunities to work together in breach of the Non-Circumvention provision.  [FF # 25-27]

11.     The Branta Entities did not first seek or obtain Newfield's written consent to the communications with Newfield's partner, as required by Paragraph 4 of the Branta CA.  [FF# 28]

12.     I find that the Branta Entities' unapproved contacts with Ute Energy constituted a prior material breach of the Branta CA, predating and excusing any later communications

57

between Newfield and Ute Energy.

13.     Even had these unapproved contacts not constituted a prior material breach, there is no basis for finding that Newfield breached the Branta CA.

14.     Plaintiffs argued that Newfield breached the Branta CA's Non-Circumvention provision by having contact with Ute Energy's Mr. Jaggers concerning the acquisition of Branta E&P's share of the Uinta Basin Assets during the term of the Branta CA.

15.     The Branta CA did not prohibit Newfield from having contact with Ute Energy. The Non-Circumvention provision only prohibited Newfield from contacting "persons having existing or prospective business relations with [Branta, LLC] or its subsidiaries." [Joint Facts # 24]  It was never intended to bar either Branta or Newfield from communicating with its own partner.  [FF #21]  The language of Paragraph 4 itself only bars communications with the other party's partners or those with prospective business relationships, not one's own partners.   [Trial Ex. 27 at 027-002 ¶ 4]

16.      Under Texas law, Branta had no prospective business relationship with Ute if it did not appear reasonably certain that a "prospective contract would have been made were it not for the [alleged] interference." *Suprise v. Dekock*, 84 S.W.3d 378, 382 (Tex. App. Ct. 2002).

17.     The Branta Entities did not have an existing or prospective business relationship with Ute Energy at the time the Branta CA was entered into.  [FF # 23]

18.     The Branta Entities also did not have an existing or prospective business relationship with Ute Energy between January 7, 2011 and the termination of the Branta CA because during this time Ute Energy was barred from participating in the auction process, and that  bar was never lifted.  [FF # 33-38, 41]  Moreover, the mere hope that Ute Energy would participate in the auction is insufficient to create a prospective business relationship between Ute Energy and Branta. *Klein v. Grynberg*, 44 F.3d 1497, 1506 (10th Cir. 1995) (mere hope for a

contract is insufficient to establish a "reasonable likelihood or reasonable probability that a contract could have resulted" to support the existence of a prospective business relationship). Accordingly, I find that the Non-Circumvention provision in the CA did not preclude Newfield's contacts with Ute Energy.

19.     Finally, I find that Newfield engaged in no affirmative contacts with Ute Energy regarding the information obtained from the Branta Entities pursuant to the Branta CA or the acquisition of Branta E&P's share of the Uinta Basin Assets contemplated by the Branta CA, and therefore had no communications with Ute Energy that would have been barred by the Branta CA  had Ute Energy been a party with whom such communications were prohibited.

> **b.   The Harvest CA**

20.     The Harvest CA precluded Newfield from disclosing to Ute Energy any confidential Evaluation Materials or from discussing or disclosing the fact that discussions or negotiations were taking place concerning Harvest (US)'s assets in the Uinta Basin.  [Joint Facts # 34]

21.     Harvest has suggested that the harm it suffered from the alleged breach is that Ute Energy agreed not to – and did not – bid in the auction, causing Harvest to receive a lower price for the Uinta Basin Assets than it otherwise would have.  The communication that could give rise to these damages, if such an agreement had been reached, is the January 13, 2011 telephone call between representatives of  Newfield and Harvest.  No harm arising out of that call could give rise to a claim for breach of the  Harvest CA, however, since the Harvest CA was not executed until February 17, 2011.  [Trial Ex.  32]

22.     More generally, I find that no communications pre-dating the execution of the Harvest CA could be considered to breach the Harvest CA.

23.     Plaintiffs also suggest that Newfield breached the Harvest CA by engaging

in discussions with Ute Energy regarding the auction.

24.     Plaintiffs presented no evidence that Newfield made any affirmative contact with Ute Energy regarding the auction, or that Newfield disclosed any confidential Evaluation Materials, between the time Newfield gained access to the auction on February 17, 2011 and the transaction closing on May 17, 2011.  Indeed, the communications as to which evidence was presented constituted exclusively communications from Ute Energy to Newfield, to which there is no evidence that Newfield substantively responded.  [FF # 227-232]

25.     Newfield did not provide information subject to the Harvest CA to Ute Energy  prior to the termination of the CA.  [FF # 227-232]

26.     The March 25, 2011 email with a PowerPoint presentation that Ute Energy's Joseph Jaggers sent to Newfield's Darryl Howard, and which Mr. Howard supposedly approved, contained only publicly-available information that had already been disclosed by the Harvest Entities.  [FF # 232]

27.     Mr. Jaggers testified that Newfield never provided Ute Energy with any information in response to his requests.  [FF # 229]  Mr. Howard's general response of "looks good" to the slide sent by Mr. Jaggers on March 25, 2011 [Trial Ex. 154] did not confirm any part of the transaction that HNR had not already publicly disclosed.  [FF # 230-232]  I find that Mr. Howard did not disclose any information regarding the auction by indicating his approval of that slide, and thus that this communication did not violate the Harvest CA.

28.     Mr. Howard likewise testified that he never shared any information about the Uinta Basin Assets auction with Ute Energy prior to the termination of the CA.  [FF # 229]

29.     In the absence of any evidence that Newfield affirmatively disclosed any information regarding the fact of negotiations or the status of the auction, I find that Newfield did  not breach the Harvest CA.

### c. There Are No Damages Associated With The Alleged Breach Of Confidentiality Agreements

30. Even if Newfield had violated the terms of either the Branta CA or the Harvest CA, Plaintiffs have presented no evidence of any damages arising from such breaches.

31. Harvest claims damages from breach of the Harvest CA as a result of Ute Energy's failure to participate in the auction. This outcome, if it arose from any communication whatsoever between Newfield and Ute Energy, could only have resulted from the alleged agreement reached on the January 13, 2011 call, which predated the Harvest CA by more than one month, not from any of the later correspondence cited by Plaintiffs at trial. As such, Harvest can state no claim for damages since the alleged harm occurred before the contract was even executed.

32. Branta, too, claims the damages-causing breach of the Branta CA was the January 13, 2011 call between Mr. Jaggers and Mr. Howard.

33. Plaintiffs presented no evidence that any later communication between Newfield and Ute Energy caused Ute Energy not to submit a bid in the action, or otherwise caused Plaintiffs any harm.

34. Moreover, Plaintiffs could not have suffered any damages after March 11, 2011, when they agreed to negotiate PSAs exclusively with Newfield as no other bidders could have participated as of that date. [Edmiston Testimony (Vol. IV – 895:16-896:2)]

35. Furthermore, Plaintiffs presented no expert testimony regarding the causation of damages or the quantum of damages arising from the alleged breaches of the Harvest CA and Branta CA.

36. Instead, Plaintiffs rely exclusively on the damages analysis presented in support of their antitrust claims, where Dr. Schulman simply presumed causation and relied on Mr.

McBeath's "valuation" range. For the same reasons that the antitrust causation and damages analysis was deficient, as described in detail below, the damages calculation here cannot support an award in favor of Plaintiffs even if a breach of either confidentiality agreement had been proven.

37.     Moreover, it is self-evident that there is no logical connection between any of the later communications relied upon by Plaintiffs in support of their claims and the claimed result of Ute Energy deciding not to participate in the auction. Those communications largely were unanswered emails from Ute Energy to Newfield. [Trial Exs. 115, 130, 132, 135] I find no reason to conclude that any later communication caused Ute Energy not to bid or caused Plaintiffs any damages.

38.     Having failed to provide proof of all of the essential elements of a breach of contract claim, Plaintiffs are entitled to no relief with respect to the allege breach of the Branta CA or Harvest CA.

## II.     BID-RIGGING CLAIMS UNDER THE SHERMAN ANTITRUST ACT AND COLORADO ANTITRUST ACT

39.     Plaintiffs allege that Newfield and Ute Energy had an agreement that Ute Energy would refrain from participating in the auction for the Uinta Basin Assets, and that such agreement was an illegal contract to rig the bidding process.

40.     Section 1 of the Sherman Act prohibits "every contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce." 15 U.S.C. § 1.

41.     Plaintiffs also claim that Newfield violated the Colorado Antitrust Act, which provides that "it is illegal for any person to contract, combine, or conspire with any person to rig any bid, or any aspect of the bidding process, in any way related to the provision of any commodity or service." Colo. Rev. Stat. § 6-4-106(1).

42.     Courts look to federal antitrust cases to guide interpretation of the Colorado

Antitrust Act.  *See* C.R.S. § 6–4–119 ("[i]t is the intent of the general assembly that, in construing

this article, the courts shall use as a guide interpretations given the federal courts to comparable

federal antitrust laws.").  Claims of bid-rigging under the Colorado Antitrust Act typically rely on

federal  courts' definitions of "bid-rigging."  *See Amos v. Aspen Alps 123, LLC*, 280 P.3d 1256,

1262  (Colo. 2012).  Therefore, I will analyze the two claims together.

43.     Despite the Sherman Act's broad language, almost from its inception the Act

has been read to prohibit only those restraints of trade that are unreasonable.  *Board of Trade v.

United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).  Courts analyze

claims of unreasonable restraints on trade under the rule of reason doctrine.  In addition to this

rule of reason, the courts have also developed a doctrine of per se violations to cover those

business relationships that "because of their pernicious effect on competition and lack of any

redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without

elaborate inquiry as to the precise harm they have caused or the business excuse for their use."

*Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

44.     "Section 1 of the Sherman Antitrust Act prohibits contracts and conspiracies

that restrain trade.  Certain violations have been identified as per se illegal, requiring no

additional proof of an unreasonable restraint of trade.  Other § 1 violations require proof that a

defendant's actions resulted in an unreasonable restraint of trade."  *Smalley & Co. v. Emerson &

Cuming, Inc.*, 13 F.3d 366, 367 (10th Cir. 1993) (citation omitted).

45.     If proven, bid rigging is one such per se violation.  *United States v. Mobile

Materials, Inc.,* 881 F.2d 866, 869 (10th Cir.1989), *cert. denied,* 493 U.S. 1043, 110 S.Ct. 837,

107 L.Ed.2d 833 (1990).  "Any agreement between competitors pursuant to which contract

offers are to be submitted [to] or withheld from a third party constitutes bid rigging per se

violative of 15 U.S.C. section 1." *Id.* (quoting *United States v. Portsmouth Paving Corp.,* 694 F.2d 312, 325 (4th Cir.1982)); *see Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006).

46.     In this case, the disputed issue is whether Newfield and Ute Energy made an agreement that Ute Energy would refrain from participating in the auction for the Uinta Basis Assets during the January 13, 2011 phone call between Mr. Jaggers and Mr. Howard.  It is important to note that Plaintiffs do not challenge the effective AMIs in place between Ute Energy and Newfield.  Thus, I analyze Plaintiffs' claims to determine whether the alleged conduct was per se violative of antitrust law.

47.     A conspiracy to rig bids in violation of 15 U.S.C. § 1 is essentially an agreement among actual or potential competitors which restrains competition in or effecting interstate trade or commerce.  *United States v. Beachner Const. Co.*, 555 F. Supp. 1273, 1276 (D. Kan. 1983), *aff'd*, 729 F.2d 1278 (10th Cir. 1984).  Conspiracy may be proved through direct or circumstantial evidence.  "Indeed, often if not generally, direct proof of a criminal conspiracy is not available and it will be disclosed only by a development and collocation of circumstances."  *Id.*

48.     The Third Circuit provides that "where the disputed issue is the existence or scope of the alleged horizontal agreement that is to be inferred from circumstantial evidence, the first inquiry must be whether or not each firm alleged to have been a party to it was an actual or potential competitor in that market."  *United States v. Sargent Elec. Co.*, 785 F.2d 1123, 1127 (3d Cir. 1986).

49.     The Tenth Circuit provides that "the determination of a per se antitrust violation depends on whether there was an agreement to subvert the competition, not on whether each party to the scam could perform."  *United States v. Reicher*, 983 F.2d 168, 172 (10th Cir. 1992).

50.     The evidence at trial showed that Ute Energy operated in the Uintah Basin, and

it was interested in acquiring assets in the Uintah Basin in early 2011. [Joint Facts #17, 18].

Additionally, Newfield's decision review document listed Ute Energy among a list of potential

bidders that was "also active in the basin," despite being a list of competitors from which

Newfield "expected lower level activity." [FF # 52]. At trial, Mr. Jaggers testified that even

though Ute Energy could not compete for the entirety of the assets, he might have approached

Harvest (US) outside the auction process regarding a partial bid; even though there was no

evidence of what portion Ute Energy would have bid on, or the price it would have paid. [FF

#62].

51.     I find that based on the evidence presented at trial, Ute Energy was a potential

competitor in the auction for the Uintah Basin Assets, for antitrust purposes.

52.     When analyzing a Section 1 claim, the Supreme Court has held that "antitrust

law limits the range of permissible inferences from ambiguous evidence in a [Section] 1 case."

*Smalley & Co. v. Emerson & Cuming, Inc.*, 808 F. Supp. 1503, 1508 (D. Colo. 1992), *aff'd*, 13

F.3d 366 (10th Cir. 1993) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 588 (1986) (analyzing a Section 1 claim on a motion for summary judgment)). "Conduct

as consistent with permissible competition as with illegal conspiracy does not, standing alone,

support an inference of antitrust conspiracy." *Id.* "[A] plaintiff seeking damages for violation

of [S]ection 1 must present evidence 'that tends to exclude the possibility' that the alleged

conspirators acted independently." *Id.* (citation omitted). Therefore, plaintiff "must show that

the inference of conspiracy is reasonable in light of the competing inferences of independent

action." *Id.*

53.     The Tenth Circuit in *Matsushita* has restated a two-part evidentiary test: "(1) is

the plaintiff's evidence of conspiracy ambiguous, *i.e.*, is it as consistent with the defendants'

permissible independent interests as with an illegal conspiracy; and, if so, (2) is there any

evidence that tends to exclude the possibility that the defendants were pursuing these independent interests." *Id.* at 1509 (citing *Gibson v. Greater Park City Co.*, 818 F.2d 722, 724 (10th Cir. 1987)).

**A.      There Is No Evidence That Ute Energy and Newfield Agreed To Bid-Rig**

54.      "The essence of a claim of violation of Section 1 of the Sherman Act is the agreement itself." *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1082 (10th Cir. 2006) (citing *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 330 (1991)). Without proof of an agreement to rig bids, Plaintiffs' antitrust claims fail. *Id.* "Solely unilateral conduct, regardless of its anticompetitive effects, is not prohibited." *McKenzie v. Mercy Hosp.*, 854 F.2d 365, 367 (10th Cir. 1988). Because Plaintiffs have not met their burden of proving the existence of an agreement to rig bids, their antitrust claims must fail.

i.   There Is No Direct Evidence Of Any Bid-Rigging Agreement

55.      Here, there is no direct evidence of any bid-rigging agreement between Newfield and Ute Energy. *Champagne Metals*, 458 F.3d at 1083 ("Direct evidence [of] a Section 1 conspiracy . . . [is] evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted."). Newfield disavowed the existence of any agreement that Ute Energy would not bid in the Auction, and Ute Energy's CEO repeatedly confirmed that Ute Energy decided not to participate in the auction unilaterally, independent of Newfield. [FF # 86-100, 129-143]

56.      Mr. Jaggers' May 20, 2011 letter to Mr. Howard is not direct evidence of an agreement. In that letter, Mr. Jaggers stated that Mr. Howard "asked Ute Energy not to be involved because the existing AMIs would cover the division of interest," not that Newfield and Ute Energy "agreed." [FF # 122-124] At trial, however, Mr. Jaggers was unable to recall Mr. Howard making this request [FF # 122], and such a request is ***not*** an agreement not to bid

and does not necessarily give rise to the inference that this supposed request led to an actual agreement not to bid.

57.     I therefore find that no direct evidence of a bid rigging agreement between Newfield and Ute Energy was presented at trial.

    ii.   There Is No Circumstantial Evidence Of Bid Rigging That Can Exclude  The Possibility of Unilateral Decision-making By Newfield and Ute  Energy

58.     The circumstantial evidence also does not "exclude the possibility that [Ute Energy  and Newfield] acted independently." *Champagne Metals*, 458 F.3d at 1085 (quoting *Mitchael v.  Intraco, Inc.*, 179 F.3d 847, 856-57 (10th Cir. 1999)); *see also World of Sleep, Inc. v. La-Z-Boy  Chair Co.*, 756 F.2d 1467, 1475 (10th Cir. 1985) (holding a jury is not permitted to infer an  agreement from certain evidence, "the burden remains on the antitrust plaintiff to introduce  additional evidence sufficient to support a finding of an unlawful contract, combination, or  conspiracy [which] tends to exclude the possibility that [defendants] were acting independently.")   (citation omitted); *see also St. Louis Convention & Visitors Comm'n v. National Football League*,   154 F.3d 851, 862 (8th Cir. 1998) (noting that antitrust law "limits the range of permissible  inferences from ambiguous evidence" in a Sherman Act § 1 case and affirming judgment as matter of law where "the trial evidence did not support an inference that [defendants] were acting  pursuant to the alleged conspiracy when they declined to bid").

59.     Both Mr. Jaggers and Mr. Howard testified that any understanding they had emanating from the January 13, 2011 call related exclusively to their AMIs, and the partnership the  companies had under those agreements.  Each denied the existence of any agreement outside the  AMIs to control participation in the auction process.  Instead, their testimony expressed that each acted as one would expect  AMI partners to behave when they believed a potential acquisition fell within the scope of their  AMIs.  [FF# 87-100, 109-120]

60.     The evidence is undisputed that it is the custom and practice in the industry that parties to an AMI agreement do not bid against each other for assets covered by an AMI because doing so would be economically irrational.  [FF # 131]  It is also undisputed that Mr. Jaggers believed at the time of the auction that Ute Energy would have the option to purchase a portion of  the Uinta Basin Assets under the Rocky Point AMI if Newfield's bid was successful.  [FF # 129]  With that belief, it would have been economically irrational for Ute Energy to have bid in the auction  [FF# 131-134], and this evidence strongly supports Mr. Jaggers' testimony that he made a  unilateral and independent decision that Ute Energy would not participate in the auction.

61.     It is also undisputed that Newfield was the far larger and the better capitalized of the two AMI partners, and thus the more logical company to take the lead in the effort to acquire the  Uinta Basin Assets.  The correspondence referring to partnering in pursuing or taking the lead  arises from this logical positioning of Newfield as the lead AMI partner.  [FF# 87-100, 109-120]

62.     I find that the evidence presented at trial cannot exclude the possibility of independent action in conformity with the well-accepted practices of AMI partners, and thus cannot support the existence of a bid-rigging agreement.

63.     Moreover, I find that other communications and behaviors are inconsistent with the notion of a January 13, 2011 agreement between Newfield and Ute Energy regarding bidding or participation in the auction, and thus also cannot exclude the possibility of independent action.

64.     First, Newfield's internal deal analyses show that Newfield believed that Ute Energy was a potential bidder in the auction, even if its inability to submit a large bid had no impact on Newfield's bid.  [FF # 52, 54]

65.     Second, it would have been illogical for Mr. Jaggers to express interest in the process to Mr. Nesselrode in late January 2011 had Mr. Jaggers already agreed with Mr. Howard

that Ute Energy would not bid on the Uinta Basin Assets or otherwise participate in the auction process.  [FF# 39, 106]

66.    Third, it also would have been illogical for Ute Energy's Mr. Kalstrom to reach out  to Newfield about coordinating review of the Harvest divestiture package had an agreement already been reached that Ute Energy would not be involved.  [FF# 107]

67.    Fourth, it also appears anomalous to me that, had there been an agreement between  Mr. Howard and Mr. Jaggers, Mr. Howard would not have informed his boss or others within  Newfield of such an important agreement.  [FF# 99-100]  I also would have expected evidence of  other communications referencing the alleged agreement, but there was not a shred of evidence of  any reference to such an agreement anywhere.  Similarly, there was no evidence of any  communications between Mr. Jaggers and anyone at Ute Energy or otherwise mentioning the  alleged agreement.

68.    Lastly, had Ute Energy agreed not to bid on the Uinta Basin Assets because Newfield was going to bid on behalf of both of them, it would have been inexplicable for Ute Energy to inquire if Newfield intended to bid just days before bids were due, and yet Ute Energy  did just that.  [FF # 108]

69.    I find that Plaintiffs have not presented sufficient circumstantial evidence of an agreement  between Newfield and Ute Energy, and certainly none that excludes the possibility of independent  action.

70.    I therefore find that there is no direct or circumstantial evidence supporting the  existence of an agreement between Ute Energy and Newfield pursuant to which Ute Energy  agreed not to participate in the auction for the Uinta Basin Assets.

**B.    Plaintiffs Have Failed to Show Antitrust Injury**

71.    To prevail on their Sherman Act claim, Plaintiffs must prove, by a preponderance

of the evidence, that Plaintiffs were injured in their business or property by the alleged bid-rigging. That is, Plaintiffs must show that they were injured because of the anticompetitive effects of the alleged bid-rigging. *See Suture Express, Inc. v. Owens & Minor Distrib., Inc.*, 851 F.3d 1029, 1044 (10th Cir. 2017) ("As part of any claim under Section 1 of the Sherman Act, the plaintiff must establish 'an injury of the type the antitrust laws were intended to prevent.' This means that the plaintiff must show the challenged restraint actually injured competition, not merely a competitor.") (citations omitted).

72.    Plaintiffs must show that they were injured in their business or property by the alleged bid-rigging, that is, that they were injured because of the anticompetitive effects of the alleged bid-rigging. *Suture Express*, 851 F.3d at 1044.

73.    "The relaxed measure of proof is afforded to the amount, but not the causation of loss – the nexus between the defendant's illegal activity and the injuries suffered must be reasonably proven." *Wills Trucking, Inc. v. Baltimore & Ohio R.R. Co. (In re Lower Lake Erie Iron Ore Antitrust Litig.)*, 998 F.2d 1144, 1176 (3d Cir. 1993) (citation omitted).

74.    Here, Plaintiffs have failed to meet their burden to show that they were injured because of anticompetitive effects of the alleged bid-rigging. There is no basis to conclude that the auction price would have been higher but for the alleged agreement or Ute Energy's absence from the bidding. The evidence shows that Newfield formulated its bid with the expectation that there would be robust competition from well-funded competitors, including El Paso, Shell, Oxy, Noble and Samson who could "move the needle" at the auction. [FF # 51-53] Ute Energy, although active in the Uinta Basin, was not a competitor that Newfield believed could "move the needle" on activity. [FF # 52]

75.    During the auction process, ten companies visited the data room and attended the management presentations: El Paso, Devon, Shell, Endeavour, BBC, Newfield, ExxonMobil,

Enduring Resources, ConocoPhillips, and Berry Petroleum.  [FF #45]

76.     Because Plaintiffs do not allege that there was any agreement between Newfield and the numerous other competitors who Newfield believed could "move the needle" on the activity and the nine other companies that visited the data room, even if I had found that Newfield had an agreement with Ute Energy not to bid, there is no basis on which I can conclude that Newfield's initial bid or subsequent bid would have been higher but for such an agreement.

77.     After the initial bids were received, in discussions with BAML, Newfield understood that there were other bidders for the entirety of the Uinta Basin Assets and another bid for a portion of the Uinta Basin Assets.  [FF # 68, 151]  Thus, even assuming there was an agreement that Ute Energy would not bid, Newfield believed it still had to compete with other bidders whose identities were not known to Newfield, and whose bid amounts also were unknown, and there is no evidence from which it can be concluded that Newfield's subsequent bids would have been higher but for Ute Energy's absence as a bidder.  [FF # 50-51, 68-69]  In fact, the internal Decision Review document that was presented to senior management recommended a bid of $220 million.  [FF # 56]  Newfield's initial bid was $67.5 million higher than the initial recommended bid because it anticipated robust competition.  [FF# 56]  Had Newfield believed it had taken Ute Energy (whom the Amended Complaint alleges was the only other "serious business competitor[]" that was likely to bid in the competition [ECF No. 258, ¶¶ 16-17]) out of the competition, one would predict that Newfield's initial bid would have been lower  than its recommended bid, not $67 million higher, and that Newfield would not have increased its  bid in the second round, nor would it have paid an additional $15 million for exclusivity.  Paying for  exclusivity only makes economic sense if Newfield believed there were other strong competitors  still vying for the Uinta Basin Assets in the auction.

78.     In addition, the evidence is undisputed that Ute Energy could not have made a bid

that came close to Newfield's bid or the bid that was received from BBC [FF # 66-67, 138-140], thus suggesting that Ute Energy's participation in the auction would not have impacted the final auction price. And there is no evidence from which I can conclude that Ute Energy would have even participated in the auction but for the alleged bidding agreement.

79. Indeed, the testimony from Mr. Jaggers was that, if, hypothetically, Ute Energy were to have attempted to submit a bid for the Uinta Basin Assets, it would not have done so through the auction process because Plaintiffs' bid procedures directed submission of bids for the entirety of the Uinta Basin Assets and Mr. Jaggers did not believe Ute Energy was financially capable of submitting a competitive bid given the expected value of the assets. [FF # 138-140, 143] Instead, Mr. Jaggers testified that Ute Energy might have attempted to negotiate with Plaintiffs for part of the Uinta Basin Assets outside the context of the auction. [FF # 62] However, it is undisputed that Harvest and Branta intended to sell the Uinta Basin Assets a single package in the auction. [FF # 58-59]

80. At closing, Plaintiffs adopted the theory that they would have been able to obtain a higher price through the piecemeal sale of the Uinta Basin Assets outside of the auction. [Plaintiffs' Closing (Vol. XI – 2164:19-2166:4)] Plaintiffs presented no evidence, however, reflecting what part of the Uinta Basin Assets they might have sold to Ute Energy in that scenario, or the price that Ute Energy might have offered. They likewise presented no evidence that, once the Uinta Basin Assets were subdivided, Newfield would have been willing to participate in the acquisition of a part of the assets, or at what price. There was no evidence whatsoever as to the aggregate price that Plaintiffs would have received for the Uinta Basin Assets once broken up and sold piecemeal. For me to conclude that Plaintiffs would have obtained a higher price outside of the auction process through such a piecemeal sale would be speculative.

81.     Similarly, Plaintiffs have not shown that but for the alleged agreement Newfield would have increased its bid.  Rather, the evidence showed that Newfield crafted its bid with the expectation of robust competition.  [Trial Ex. 9 at 9-065]  The relevant Newfield business unit recommended a valuation of $220 million for the Uinta Basin Assets, but, because of the expected  competition, Newfield's senior executive team increased the amount if would bid from $220  million to $287 million, and then to $295 million, with an additional $15 million to purchase the  right to negotiate exclusively for one week.  [Trial Exs. 127, 128, 137]

82.     There was no credible evidence presented at trial that Newfield would have submitted a  higher bid had Ute Energy participated.  Indeed, Newfield's Mr. Boothby testified categorically  that he would not have agreed to pay any additional amount for the Uinta Basin Assets.  [Boothby  Testimony (Vol. VIII – 1692:18-21, 1693:4-11, 1697:10-15)]

83.     Though Plaintiffs' expert, Dr. Schulman, testified that the participation of additional bidders in an auction, without more, tends to lead to a higher price paid in auctions, I did not find his testimony credible or well-founded in the economics literature on which he relied.  Rather, I give credence to Dr. Burtis' testimony that, in sealed-bid auctions like the one that took  place here, what matters is a bidder's expectations of competition, namely from the expected next  highest bidder and its expected bid amount.

84.     Dr. Burtis testified how auctions of this sort function and the paramount importance  of a bidder's estimation of the valuation that other bidders are likely to attach to the asset that is  the subject of the auction.  [Burtis Testimony (Vol. X – 1920:4-1929:1)]  According to Dr. Burtis,  it is only in very specific circumstances where the number of bidders is the primary determinant   of the high bid – *i.e.*, where the bidders are purchasing the asset with the intent of keeping it  indefinitely for their own private benefit rather than with the intent to resell the asset in a  commercial venture.  [Burtis Testimony (Vol. X – 1927:3-1927:15)]  In the context of

commercial ventures, the mere presence of additional bidders is unlikely to increase a given bidder's perception of what it should bid for the asset, at least absent evidence that the existing bidders are aware of the additional bidders and if they are perceived by the existing bidders to have more resources and to value the asset higher. [Burtis Testimony (Vol. X – 1929:2-1930:10, 1932:8-22, 1958:17-1959:1)]

85.     Here, there was no evidence presented that Newfield was told in the auction how many other bids had been made. Rather, Mr. Massaro and Mr. Howard were told only that there were "other bidders." [FF# 169]

86.     I cannot find that Plaintiffs have shown, by a preponderance of the evidence, that the addition of a single bidder would have impacted the final outcome of the auction because Newfield was never told how many bidders – or which bidders – had participated in the auction and thus I have no reason to believe that Newfield would have raised its maximum bid value based on the participation of another bidder.

87.     I also find there is no non-speculative evidence that suggests Plaintiffs would have received a price for the Uinta Basin Assets in excess of that received in the auction had they elected to sell the assets piecemeal.

88.     I therefore find that Plaintiffs have not proven by a preponderance of the evidence that the  final auction price would have been different, and therefore Plaintiffs have failed to prove  antitrust injury.

### C.     Plaintiffs Have Failed To Show Any Non-Speculative Damages

89.     Plaintiffs' theory of damages is that, but for the alleged agreement, Ute Energy would have participated in the auction and the final sale price would have been higher, with the appropriate measure of damages being the difference between the sale price ($308 million) and the final sale price in the "but for" world." [Schulman Testimony (Vol. VI – 1126:21-1127:5,

1133:8-11)]

90.     Plaintiffs, however, have failed to establish with reasonable certainty the price they  would have received in the "but for" world.

91.     Furthermore, Plaintiffs speculated in closing that Ute Energy might have made an offer on part of the Uinta Basin Assets outside the auction process, that BBC would have made its bid, and that Newfield would have made a bid, and, somehow, Plaintiffs would have been able to divvy up the assets between the three parties and obtain a more favorable aggregate price. [Plaintiffs' Closing (Vol. XI – 2165:9-2166:4)]  Plaintiffs' experts, however, did not evaluate what this scenario would look like or what the expected outcome would have been.  [Mimms Testimony (Vol. X – 1984:23-1985:14, 1986:11-19, 1989:11-1990:16)]  Any attempt to assign damages based on a "but for" world that was not even considered by the experts and was not supported by any evidence at trial would be speculative.

92.     Even if I found an award of damages appropriate under these circumstances, I cannot rely on the damages analysis proffered at trial.  Plaintiffs' expert, Mr. McBeath, provided a  range of values for the Uinta Basin Assets, untethered from any analysis of what the expected bids for some or part of the assets would have been in the "but for" world.  [FF # 185]  He did not  offer up an opinion as to what the bid or range of bids would have been had Ute Energy participated.

93.     Even if Mr. McBeath's analysis were relevant to establishing what the winning bid would have been in the "but for" world, or what the aggregate amount received from the piece-meal sale Plaintiffs' hypothesized at closing would have been, it fails to provide a damages estimate with reasonable certainty.

94.     First, Mr. McBeath's damages are predicated on the insupportable assumption that the basal carbonate was a probable reserve.  To be categorized as a probable reserve, the basal

carbonate had to have been proved commercial. The undisputed evidence at trial was that the basal carbonate had not been proved to be commercial at the time of the auction because no horizontal drilling had been tested, and no horizontal wells had been drilled economically. [FF# 190-191] Because Mr. McBeath improperly characterized the basal carbonate as a probable reserve, he performed a discounted cash flow analysis on it, and assigned greater value to it than appropriate.

95. As Mr. McBeath acknowledged, if the basal carbonate was not commercial, it should have been characterized as a contingent resource, with no positive value assigned to it in his valuation. [FF# 193-195] Because Mr. McBeath instead assigned a value of $96 to $326 million to the basal carbonate, his analysis cannot credibly be relied on.

96. Second, Mr. McBeath failed to account for the high costs associated with developing the Uinta Basin Assets. Harvest's own materials identify the Uinta Basin Assets as a "resource play." Even Mr. McBeath acknowledged that it is improper to account for the costs of successful wells only because, in resource plays, you are not assured a 100% drilling and production success rate. [FF# 197-200] And yet that is exactly what Mr. McBeath did in his damages analysis. The ignored costs were over $700 million. [FF# 201]

97. Because of these primary (not exclusive) deficiencies in Mr. McBeath's damages analysis, I find that he did not offer a damages estimate with the requisite reasonable certainty to support an award of damages in this case.

98. Even if the deficiencies identified above were not fatal, Mr. McBeath has provided an inordinately broad range for the valuation of the assets – from $328 million to $653.8 million. [McBeath Testimony (Vol. VI – 1192:11-14, 1250:5-9)] This makes the top end of the valuation roughly twice that of the low end and, if the $308 million purchase price is deducted (per Plaintiffs' damages theory), gives a range of damages from $20 million to $345.8 million,

making the top end of the damages range more than 17 times the bottom end. While antitrust plaintiffs are not required to prove their damages with absolute certainty, such an extreme range of potential damages suggests that any award would be based on no more than mere speculation. *See World of Sleep, v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1478 (10th Cir. 1985).

99.    In recognition of the huge range offered by Mr. McBeath, Plaintiffs' counsel offered at closing that a damages award number of not more than $400 million would be non-speculative. Plaintiffs offered, and I find, no basis in the record to pick this number above any other.

100.    I therefore find that, even if Plaintiffs had been able to prove at trial that there existed an agreement between Newfield and Ute Energy that Ute Energy would not participate in the auction for the Uinta Basin Assets, and that Newfield and Ute Energy were actual or potential competitors in the auction, Plaintiffs have not proven that the final auction price would have been different, and therefore Plaintiffs have failed to prove either an antitrust injury or any damages.

### III.    TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIP WITH UTE ENERGY

101.    Plaintiffs allege that Newfield interfered with their prospective business relationship with Ute Energy.

102.    Colorado recognizes the tort of intentional interference with prospective business relations. *Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1119 (10th Cir. 2009). "One who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from the loss of benefits of the relation . . . ." *MDM Grp. Assocs., Inc. v. CX Reinsurance Co.*, 165 P.3d 882, 886 (Colo. App. 2007) (quoting *Restatement (Second) of Torts* § 766B (1979)). "While the existence of an underlying contract is

not required for this tort, there must be a showing of improper and intentional interference by the defendant that prevents the formation of a contract between the plaintiff and a third party." *Id.*; *cf. Puls v. Landmark Cmty. Newspapers, Inc.*, No. 08-1263, 2009 WL 1927442, at *10 (10th Cir. July 7, 2009) (citing *MDM Grp. Assocs., Inc.*). However, in order to prove that there is a protected prospective business relationship, the plaintiff must show that there is "a reasonable likelihood or probability that a contract would have resulted; there must be something beyond a mere hope." *Hertz*, 576 F.3d at 1119 (quoting *Klein v. Grynberg*, 44 F.3d 1497, 1506 (10th Cir. 2008)).

103.    I found above that Ute Energy had no prospective business relationship with Branta during the relevant time period.  [FF # 23, 225-226]

104.    Similarly, I find that Harvest had no prospective business relationship with Ute Energy. [FF# 23]

105.    Ute Energy's CEO, Mr. Jaggers, testified that Ute Energy never considered participating in the auction for the Uinta Basin Assets, and made the decision not to participate unilaterally, without any interference from or involvement of Newfield.  [FF # 128-146]

106.    Ute Energy's lack of consideration of submitting a bid in the auction, when combined with the undisputed evidence that Ute Energy lacked the resources to submit a competitive bid regardless, confirms that there was not a reasonable likelihood that Ute Energy would have entered into a contract for the sale of all or part of the Uinta Basin Assets with Plaintiffs.

107.    Having had no reasonable likelihood or probability that a contract would have resulted but for the alleged interference by Newfield, Plaintiffs cannot prove the tort of tortious interference with prospective business relations.

108.    Even if Plaintiffs had shown a prospective business relationship between all or

one of them and Ute Energy, Plaintiffs have not presented evidence of any improper conduct that would give rise to a tortious interference claim. As I have found in connection with Plaintiffs' antitrust claims, I find no evidence of an improper agreement between Ute Energy and Newfield. Moreover, I do not find that Newfield improperly deceived Ute Energy regarding the scope of the Rocky Point AMI. Mr. Howard was unaware of the limitations in the coverage of the Rocky Point AMI at the time of the January 13, 2011 phone call with Mr. Jaggers, as was Mr. Jaggers, himself. [FF# 112, 115-120] I do not find that Mr. Howard had an affirmative obligation to inform Mr. Jaggers or others at Ute Energy of the plain language of their contract.

## IV. CIVIL CONSPIRACY

109. Plaintiffs claim that Newfield's conduct constituted a civil conspiracy.

110. To support this claim, Plaintiffs must show: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) an unlawful overt act; and (5) damages as to the proximate result. *Wagner v. Universal Fin'l Grp., Inc.*, No. 14-cv-01297, 2015 WL 12967850, at *10 (D. Colo. Aug. 21, 2015) (citing *Nelson v. Elway*, 908 P.2d 102, 106 (Colo. 1995)). Plaintiff must present evidence of an agreement; the court may not infer its existence. *Id.* "Additionally, the purpose of the conspiracy must involve an unlawful act or unlawful means. A party may not be held liable for doing in a proper manner that which it had a lawful right to do." *Id.* (citations omitted).

111. For the same reasons for which I find no Sherman Act or Colorado Antitrust Act violations, I find Plaintiffs have failed to prove that Newfield has committed a civil conspiracy.

## V. CONCLUSION

112. Based on the foregoing Findings of Fact and Conclusion of Law, I make the following rulings. First, I find that Plaintiffs have failed to prove that Defendant Newfield breached either the Harvest CA or Branta CA by a preponderance of the evidence. Second, I find

that Plaintiffs have failed to prove that Newfield and Ute Energy entered into an agreement to rig bids in violation of either the Sherman Act or the Colorado Antitrust Act.  Third, I find that Plaintiffs have failed to prove that Newfield tortuously interfered with any prospective contract or business relationship between Plaintiffs and Ute Energy.  Finally, I find that Plaintiffs have failed to prove that Newfield participated in any civil conspiracy.

113.    Accordingly, Final Judgment shall enter in favor of Defendant Newfield Production Company on each of Plaintiffs' claims of relief, and each claim is hereby **Dismissed With Prejudice.**

Dated:  April 12, 2018.

BY THE COURT:


/s/ *Wiley Y. Daniel*_____
WILEY Y. DANIEL,
SENIOR UNITED STATES DISTRICT JUDGE